STATE of Wisconsin, Plaintiff-Appellant-Petitioner,

v.

John J. WATSON, Respondent-Respondent.

Supreme Court

*No. 95–1067. Oral argument December 1, 1998.—Decided June 29, 1999.*

(Also reported in 595 N.W.2d 403.)

For the petitioner-appellant-petitioner the cause was argued by *Sally L. Wellman*, assistant attorney general, with whom on the briefs was *James E. Doyle*, attorney general.

For the respondent-respondent there were briefs and oral argument by *Richard D. Martin*, assistant state public defender.

¶ 1. DAVID T. PROSSER, J. This case presents questions of evidence and procedure in the application of Wisconsin's Sexually Violent Person Commitments statute, popularly known as the Sexual Predator Law.[1]

¶ 2. The State of Wisconsin (State) seeks review of an unpublished decision of the court of appeals which affirmed a circuit court order dismissing the "sexual predator" commitment petition filed against John J. Watson (Watson).[2] After an evidentiary hearing, the Dane County Circuit Court, Angela B. Bartell, Judge, dismissed the State's petition on grounds that

[1] Wis. Stat. §§ 980.01–980.13 (1995–96). All references to the Wisconsin Statutes are to the 1995–96 version unless otherwise noted.

[2] *State v. Watson*, No. 95–1067, unpublished slip op. (Wis. Ct. App. Dec. 11, 1997).

171

the State had failed to establish probable cause that Watson's conviction for false imprisonment in 1980 was a "sexually motivated" violent offense. In this review, we are asked to decide several questions, including:

1. Does a clinical psychologist who is qualified at a hearing to testify as an expert, properly testify as an expert when he offers an opinion as to a defendant's "sexual motivation" in committing an offense? Our answer is yes.

2. Is a clinical psychologist, in forming an expert opinion, entitled to rely on the contents of a Presentence Investigation (PSI), including an inadmissible hearsay statement of the defendant that is part of the written narrative of a victim prepared for the PSI? Our answer is yes.

3. Is the opinion of a clinical psychologist who relies in whole or in part on inadmissible hearsay evidence itself admissible in evidence? Our answer is yes.

4. Does a psychologist's opinion, based solely on a hearsay statement of the defendant that is reported in a PSI but disputed by the defendant, constitute probable cause to believe that defendant's offense was "sexually motivated"? Our answer is no.

¶ 3. Notwithstanding our answer to the last question, after carefully reviewing the record of the probable cause hearing, including the nature and circumstances of the predicate offense, the exhibits offered and received, and the testimony of the expert witness, we are convinced that the State succeeded in establishing probable cause. Consequently, the deci-

sion of the court of appeals affirming the circuit court's order dismissing the commitment petition is reversed and the cause is remanded for further proceedings.

## FACTS AND PROCEDURAL BACKGROUND

### I.

¶ 4. The respondent, John Watson (D.O.B. 7–09–21), has a long criminal record dating back to the 1940s. In 1953, he was convicted of carnal knowledge and abuse of a minor. In 1972, he was convicted of attempted rape and two counts of endangering safety by conduct regardless of life for an incident in 1971. In 1972, he was also convicted of burglary and battery for an incident in 1969.[3] By January of 1980, Watson, then 58, had been released on parole and been living in the community for about two years.

¶ 5. On January 21, 1980, shortly after 7:00 a.m., Watson picked up a young woman hitchhiker on South Park Street in Madison. The woman was heading to Old University Hospital. According to a criminal complaint, Watson drove north on Park Street; then, departing from the normal route, he turned left and entered the Arboretum. Watson assured his passenger that nothing was amiss but suddenly he pulled off into a parking area and flashed a knife. Watson reportedly stated: "Do as I say or I'll beat you." The young woman began to struggle and Watson responded by hitting her about the head with what she believed was a hammer wrapped in a white cloth. Watson forced the woman into the back seat, forced her hands behind her back, taped them together, put a cloth in her mouth, then wrapped white tape around her head. The young

---

[3] *See Watson v. State*, 64 Wis. 2d. 264, 219 N.W.2d 398 (1974).

woman told police that Watson hit her between six and twelve times with the hammer and threatened her with more. Climbing back into the driver's seat, Watson drove off heading for the beltline highway.[4] While he was driving, his passenger worked to remove the tape from her hands and mouth. After getting loose, she managed to open the passenger door and dangle her right leg out the door in an effort to attract attention. When Watson slowed the car to deal with the situation, the victim succeeded in rolling out the door onto the highway, noting the license number of Watson's tan Pontiac as it sped away.

¶ 6. Within an hour, Watson picked up another young woman hitchhiker while driving east on the beltline. According to the criminal complaint, the woman explained to Watson where she worked and then became alarmed when he failed to stop at her turnoff. Watson subsequently drove his car off the highway onto a side street and stopped. When the young woman attempted to escape, he grabbed her around the neck and began striking her with a hammer. She managed to break loose and get out of the car. He followed her with the hammer and struck her repeatedly and dragged her back inside the car. After a lengthy beating, the young woman again escaped, falling into a ditch. She eventually secured help. The criminal complaint quoted the emergency room doctor at a Madison hospital as saying that the victim received at least 17 blows to the skull as well as blows to the facial area and extremities. The doctor reportedly required four hours to stitch up the victim's wounds.

---

[4] The "beltline" refers to State Highways 12 and 18 which run together east-west near the south end of Madison.

¶ 7. Watson was arrested shortly after these incidents when his tan Pontiac was spotted by a McFarland police officer. Before his apprehension, he drove wildly, attempting to escape the officer. When Watson was finally arrested, police found blood throughout the interior of his vehicle. Watson himself was carrying two knives. He was identified by both victims from photo line-ups.

¶ 8. On January 24, 1980, the State charged Watson with one count of battery in violation of Wis. Stat. § 940.19(1) (1979–80),[5] two counts of false imprisonment in violation of Wis. Stat. § 940.30,[6] and one count of endangering safety by conduct regardless of life in violation of Wis. Stat. § 941.30.[7] On February 14, 1980, he was charged as a repeater. No preliminary examination was ever held.

¶ 9. On February 20, 1980, Watson pled guilty to all counts, stating in part that "some things in there [the complaint] were not quite accurate pertaining to me and pertaining to the young ladies, but in the end result, it wouldn't make any difference. . . ."

¶ 10. A sentencing hearing was held on April 9, 1980. Prior to the hearing, Robert Moore, Watson's parole agent with the State Bureau of Community Corrections, prepared a 14-page Presentence Investigation

---

[5] All four offenses were charged under the 1979–80 Wisconsin Statutes.

[6] Wisconsin Stat. § 940.30 (1979–80) provided: "Whoever intentionally confines or restrains another without the person's consent and with knowledge that he or she has no lawful authority to do so is guilty of a Class E felony."

[7] Wisconsin Stat. § 941.30 (1979–80) provided: "Whoever endangers another's safety by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life, is guilty of a Class D felony."

(PSI). Among other things, Moore's PSI comprehensively repeated the allegations of the criminal complaint, detailed an interview between the agent and the first victim, quoted at length a written statement prepared by the second victim, quoted from Watson's statement at the plea hearing and his explanations to his agent, and reported Watson's claim that in both incidents the young ladies insulted him and made racial remarks.

¶ 11. The written statement of the second victim contained two allegations not present in the criminal complaint. Victim II described the assault:

> Then he slams on the brakes. I grabbed for the door handle, but he got me by the hair and pulled my head down, holding me in a headlock with his right arm.
>
> "Now you're gonna suck me off, bitch. Now you're gonna suck me off" he says.

Victim II also wrote of her injuries:

> "Get in the backseat, bitch, stay in the back." He pushes my left leg into my chest and violently beats my groin with the hammer. . . .
>
> [At the hospital] Someone asks if I'm menstruating. I say no. I feel my crotch. I wonder why. Then some of the beating comes back to me. . . .Moving around for each Xray makes my eyes water. Everything hurts so much. My legs are screaming painful. . . .

¶ 12. At the April 9, 1980, sentencing hearing, Watson and his attorney, Gridley Hall, were given an opportunity to go off and study the PSI together. They came back and took exception to Victim II's statements about the sexual nature of the assault:

Mr. Hall: Your Honor, there are two matters which are, I think, of major significance that my client takes issue with in the pre-sentence and a few other minor details.

The first matter would be statements on pages 6 and 7 with reference to the sexual nature of the attack on [Victim II], and there is a statement which Mr. Watson allegedly made, the remark is: "Now you are going to suck me off." Mr. Watson denies ever having made that statement. On page 7 there is an allegation that he beat the victim in the groin area. He also specifically denies that allegation.

. . .

I would move, Your Honor, to delete from the pre-sentence investigation the items which I have mentioned which we find to be irrelevant.

¶ 13. Victim II was not present during the sentencing hearing. When Assistant District Attorney John Burr made his sentencing recommendation, he said in part:

The facts of this case are, I think, fully documented for the Court. I guess the evidence that we possess would show that [Victim II] was struck in the groin area with a hammer. Her injuries are consistent with that. I object to the Court striking that from the pre-sentence.

¶ 14. In imposing sentence, Dane County Circuit Judge Angela Bartell said in part:

The court will not strike from the record the reference in the pre-sentence report to the sexual nature of the attack on [Victim II]. There is no evidence that has been produced in contradiction of that pre-

177

sentence report and that particular factual allegation. That stays on the record, as well as Mr. Watson's denial of it, and that is a typical dispute of fact that the Court has to deal with in sentencing and is appropriately part of this record; and the same is my ruling with regard to the reported statement attributed to Mr. Watson in the course of the attack, the same ruling I made with regard to the allegation of injuries or attack in the groin area.

¶ 15. The circuit court, recognizing Watson's repeater status, imposed a sentence of three years on the battery, eight years on each count of false imprisonment, and eleven years on the endangering safety charge, to be served consecutively to each other and to the offense for which his parole was revoked.

## II.

¶ 16. Watson was scheduled to be released from his lengthy sentence on December 28, 1994. During his incarceration, the Wisconsin legislature created Chapter 980 of the statutes, concerning Sexually Violent Person Commitments. The statute authorizes the involuntary commitment of a sexually violent person—who meets specific statutory criteria—"for control, care and treatment until such time as the person is no longer a sexually violent person." Wis. Stat. § 980.06. The purpose of this statute is to "protect the public and to provide concentrated treatment to convicted sexually violent persons. . . ."[8]

¶ 17. On December 27, 1994, the State filed a petition in Dane County Circuit Court seeking to detain Watson as a sexually violent person. Circuit Judge Patrick J. Fiedler issued an order holding Wat-

---

[8] *State v. Carpenter*, 197 Wis. 2d 252, 258, 541 N.W.2d 105 (1995).

son for a "Preliminary Hearing" on December 29, 1994. On that date, after a hearing, Circuit Judge Jack A. Aulik ordered Watson detained at Mendota Mental Health Institute "for an evaluation as to whether he is a sexually violent person." On January 23, 1995, acting on the renewal of previously made motions, Circuit Judge Angela Bartell—the same judge who had imposed Watson's sentence in 1980—dismissed the petition on grounds that the document was insufficient to confer jurisdiction in the court. Judge Bartell temporarily stayed Watson's release. The court of appeals, in a series of orders, also temporarily stayed his release.

¶ 18. On March 17, 1995, following a hearing, Judge Bartell denied the State's motion for a permanent stay of release pending appeal and on March 20, 1995, the court of appeals deferred to the circuit court's judgment. In an order dated March 21, 1995, this court granted the State a short delay of Watson's release in order to file an amended petition.

¶ 19. An amended petition was filed on March 23, 1995, and the sufficiency of the petition was approved by Judge Bartell. A probable cause hearing was ordered, and held on April 7, 1995. The evidence offered at that probable cause hearing is the subject of this case.

III.

¶ 20. Chapter 980 of the statutes sets out the procedure for the involuntary commitment of a sexually violent person. The procedure includes the filing of a sexually violent person petition, Wis. Stat. § 980.02, a probable cause hearing, Wis. Stat. § 980.04, and a trial, by jury if requested, in which the State has the burden of proving its allegations beyond a reasonable doubt. Wis. Stat. § 980.05.

¶ 21. Wisconsin Stat. § 980.01 defines terms for Chapter 980. A "sexually violent person" is defined, in part, as a "person who has been convicted of a *sexually violent offense. . .*and who is dangerous because he. . .suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." (Emphasis supplied)

¶ 22. A "sexually violent offense" is defined in three categories. Wis. Stat. § 980.01(6)(a), (b), and (c).

¶ 23. The first category is any crime specified in §§ 940.225(1) or (2), 948.02(1) or (2), 948.025, 948.06, or 948.07. Conviction of one of these offenses—first or second degree sexual assault, sexual assault of a child, incest with a child, or child enticement—is per se a conviction of a sexually violent offense.

¶ 24. The second category is any crime specified in §§ 940.01, 940.02, 940.05, 940.06, 940.19(4) or (5), 940.30, 940.305, 940.31, or 943.10 but only when the crime has been determined at trial "to have been sexually motivated." This list of crimes includes false imprisonment (§ 940.30) but not the other offenses with which Watson had been charged in 1980. "Sexually motivated" means that one of the purposes for an act is for the actor's sexual arousal or gratification. Wis. Stat. § 980.01(5).

¶ 25. The third category is any "solicitation, conspiracy or attempt" to commit a crime under either of the first two categories.

¶ 26. In the definition section, "sexually violent offense" is not limited by time. However, the statute elsewhere requires the petition for commitment of a person to allege that the "person is within 90 days of discharge or release. . .from a sentence that was imposed for a conviction for a sexually violent offense. . . ." Wis. Stat. § 980.02(2)(ag). Hence, the stat-

ute appears to preclude a sexually violent offense in the past from serving as the predicate offense for a petition, probable cause hearing, or trial if the offense is not an offense from which the person is being discharged or released.[9]

¶ 27. At the probable cause hearing under Wis. Stat. § 980.04(2), the State must establish probable cause that the named person (1) has been convicted of a sexually violent offense; (2) is within 90 days of being released from conviction of a sexually violent offense; (3) has a mental disorder (that is, a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to engage in acts of sexual violence);[10] and (4) is dangerous to others because of his mental disorder in that there is a substantial probability that he will engage in future acts of sexual violence.

¶ 28. At Watson's April 7, 1995, hearing, the State presented Dr. Richard Althouse, a clinical psychologist, as its only witness. Dr. Althouse interviewed Watson on two separate occasions for a total of about two and one-half hours. In preparation for those interviews, Dr. Althouse reviewed Watson's Department of Corrections social services file, the Bureau of Clinical

---

[9] In *State v. Irish*, 210 Wis. 2d 107, 565 N.W.2d 161 (Ct. App. 1997), the court upheld the commitment of a man who was convicted in 1991 of child enticement under Wis. Stat. § 944.12 (1987–88). Wisconsin Stat. § 944.12 was later repealed and recreated as Wis. Stat. § 948.07, which is the child enticement provision set out in Wis. Stat. § 980.01(6)(a). The court of appeals concluded that child enticement under the old § 944.12 was the "crime" specified in § 948.07. Irish was still serving his sentence for the 1991 conviction at the time his commitment petition was filed in 1994.

[10] Wis. Stat. § 980.01(2).

Services confidential file, including the presentence investigation (PSI), and Watson's legal file. These files contained investigative reports, program review reports, parole commission reports, and transcripts of various hearings. Dr. Althouse acknowledged reviewing the 1980 criminal complaint and the transcript of the 1980 sentencing hearing. He also completed a Hare psychopathy checklist evaluating Watson.

¶ 29. After the State had qualified Dr. Althouse as an expert and detailed his preparation for the Watson interviews, the assistant district attorney asked him whether he had formed an opinion to a reasonable degree of psychological certainty as to whether Watson suffered from a mental disorder. Dr. Althouse replied:

> I believe that Mr. Watson suffers from the mental disorder of paraphilia. . . .Paraphilia is a diagnosis found in the Diagnostic and Statistical Manual of the American Psychiatric Association. . .and in that reference paraphilia is loosely defined as a condition that results in urges, uncontrollable urges, *that involves sexual contact with non-consenting partners*. (Emphasis supplied.)[11]

---

[11] During the probable cause hearing, the State offered and the court accepted two pages from the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994) (DSM-IV), defining and describing paraphilia. Section 302.70 of DSM-IV states that "[t]he essential features of a Paraphilia are recurrent, intense sexually arousing fantasies, sexual urges, or behaviors generally involving 1) nonhuman objects, 2) the suffering or humiliation of oneself or one's partner, or 3) children or other nonconsenting persons, that occur over a period of at least 6 months. . . .Paraphiliac imagery may be acted out with a nonconsenting partner in a way that may be injurious to the partner (as in Sexual Sadism or Pedophilia)." Section 302.70 of DSM-IV also

¶ 30. Dr. Althouse was then asked, based upon his training, education, and experience, written materials made available to him, his interviews with Watson, and the Hare psychopathy checklist he had completed, whether he had formed an opinion to a reasonable degree of psychological certainty as to whether Watson was dangerous to others. He replied:

> To a reasonable degree of psychological certainty I have made such a determination. It is my professional opinion that Mr. Watson does indeed pose a danger to others.

¶ 31. Asked as an expert if he had an opinion whether Watson was substantially probable to engage in future acts of sexual violence, Dr. Althouse replied:

> Yes, it is also my opinion to a reasonable degree of professional certainty that Mr. Watson is quite likely to re-offend.

¶ 32. After many objections to his questions, the assistant district attorney asked:

> Q: Doctor, based on your training, education, and experience, your conversations with Mr. Watson, your review of all the written materials that you testified to, did you form an opinion to a reasonable degree of psychological certainty as to whether Count 3 [false imprisonment] in Exhibit 1 was a. . .sexually motivated offense?
>
> . . .

---

states that the Paraphilias described are conditions that have been specifically identified by previous classifications including, among others, Frotteurism (touching and rubbing against a nonconsenting person) and Sexual Sadism (inflicting humiliation or suffering).

A: It is my professional opinion based upon my experience that the offense was sexually motivated.

¶ 33. Throughout his testimony, Dr. Althouse acknowledged that he had relied on the purported statement by Watson: "Now, you're gonna suck me off, bitch. Now you're gonna suck me off." Watson denied making that statement in 1980 and denied making the statement in his interviews with Dr. Althouse. At the hearing, Watson's attorney, Reesa Evans, consistently and repeatedly objected to the alleged statement as hearsay. She objected to the admissibility of the PSI, and Judge Bartell admitted the PSI solely as material used by Dr. Althouse in forming his opinion. The PSI was not admitted for the truth of the contested materials contained therein.

¶ 34. At the end of the hearing, Judge Bartell found that the statement attributed to Watson by Victim II in the PSI was the controlling factor in Dr. Althouse's opinion that the false imprisonment charge against Victim II was "sexually motivated." That statement was inadmissible hearsay, she concluded. Without that statement, Dr. Althouse had no opinion as to whether the predicate crime was sexually motivated. To be given evidentiary weight, Dr. Althouse's opinion had to be based on facts established independently by other evidence. Since the statement upon which his opinion was based was not independently established, it did not provide probable cause that the predicate offense was "sexually motivated." Therefore, the court dismissed the petition.

¶ 35. The State appealed. The court of appeals certified the case to this court, framing the issue as whether an expert's opinion is inadmissible when it is based solely on evidence that is itself inadmissible but is of a type reasonably relied on by experts in the field.

184

Following oral argument, this court issued a per curiam order stating that the court was equally divided whether to affirm or reverse, with one justice abstaining from participation. The court vacated the order granting certification and remanded the case to the court of appeals for decision.

¶ 36. Upon remand to the court of appeals, a divided court issued a decision affirming the order of the circuit court dismissing the petition for lack of probable cause. The court of appeals held that Dr. Althouse's opinion on sexual motivation was not an expert opinion and that the information he relied upon in forming his opinion was not the type reasonably relied upon in the formation of an expert opinion. The court of appeals found it most troubling that the State's case rested solely on Dr. Althouse, whose opinion in turn rested solely on Watson's PSI statement—a statement that was both contested by Watson and inadmissible hearsay.

¶ 37. Judge Charles Dykman dissented, concluding that the circuit court erred in dismissing for lack of probable cause on sexual motivation. Judge Dykman concluded that the record indicated that Dr. Althouse's opinion was based on more than Watson's PSI statement and that the record as a whole supported probable cause.

¶ 38. The State petitioned this court for review of the decision of the court of appeals. This court granted review to consider whether an expert's opinion testimony that Watson's illegal act was sexually motivated, based on inadmissible hearsay evidence, is itself admissible evidence, and if it is, whether it is sufficient for probable cause.

## ANALYSIS

¶ 39. This case requires us to reflect on expert testimony under Wis. Stat. §§ 907.02 and 907.03 and to examine the purpose of the probable cause hearing under Wis. Stat. § 980.04 in a Sexually Violent Person Commitment.

## IV.

¶ 40. The first issue is whether Dr. Richard Althouse properly testified as an expert when he offered an opinion on "sexual motivation" in this sexual predator case.

██

¶ 41. Expert testimony is admissible only if it is relevant. *State v. Pittman*, 174 Wis. 2d 255, 267, 496 N.W.2d 74 (1993), *cert. denied*, 510 U.S. 845 (1993); Wis. Stat. § 904.01. Moreover, its admissibility depends on whether it will "assist the trier of fact to understand the evidence or to determine a fact in issue. . . ." Wis. Stat. § 907.02. The decision whether an expert's testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue is a discretionary decision of the circuit court. *Pittman*, 174 Wis. 2d at 268; *State v. Friedrich*, 135 Wis. 2d 1, 15, 398 N.W.2d 763 (1987). "We review a discretionary decision only to determine whether the trial court examined the facts of record, applied a proper legal standard, and, using a rational process, reached a reasonable conclusion." *Pittman*, 174 Wis. 2d at 268 (quoting *State v. Hamm*, 146 Wis. 2d 130, 145, 430 N.W.2d 584 (Ct. App. 1988)). This court will not reverse unless the circuit court's use of discretion is wholly unreasonable. *Pittman*, 174 Wis. 2d at 268; *State v.*

*Johnson*, 118 Wis. 2d 472, 481, 348 N.W.2d 196 (Ct. App. 1984).

■

¶ 42. Under Wis. Stat. § 907.02,[12] if a witness is qualified as an expert and has specialized knowledge that is relevant because it will assist the trier of fact to understand the evidence or determine a fact in issue, the expert's analysis or opinion will normally be admitted into evidence. That a lay witness of ordinary intelligence may also understand the subject matter does not mean that the opinion of an expert in the field would not be of assistance to the trier of fact in understanding the evidence or determining a fact in issue. *State v. Eichman*, 155 Wis. 2d 552, 569, 456 N.W.2d 143 (1990). As a general rule, then, it is not an erroneous exercise of discretion for the court to admit expert testimony so long as the testimony aids the trier of fact in consideration of the issues. *Cf. State v. Sarabia*, 118 Wis. 2d 655, 668, 348 N.W.2d 527 (1984) (citing *State v. Johnson*, 54 Wis. 2d 561, 564–65, 567, 196 N.W.2d 717 (1972)).

¶ 43. The court of appeals reached a different conclusion. It indicated that Dr. Althouse was not testifying as an expert on the sexual motivation issue. It argued that expert testimony is testimony on a subject which is distinctly related to some science, profession, business, or occupation, and, consequently, "beyond the realm of the average lay person." *Watson*, No. 95–1067, slip op. at 6.

---

[12] Wisconsin Stat. § 907.02 states:

**Testimony by experts.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

187

¶ 44. The court of appeals restricted the admissibility of expert testimony when it wrote:

> A court will receive expert testimony in evidence only "when the issue under consideration involves 'special knowledge or skill or experience on subjects which are not within the realm of the ordinary experience of [hu]mankind,'" *Grace v. Grace*, 195 Wis. 2d 153, 159, 536 N.W.2d 109, 111 (Ct. App. 1995) (quoted source omitted). . . .

*Watson*, No. 95–1067, slip op. at 6.

¶ 45. This summation is too limited. Wisconsin Stat. § 907.02 is more open to expert testimony than the formulation above because it permits expert testimony when the testimony will "assist the trier of fact to understand the evidence . . ."

¶ 46. In *Grace*, the court was not dealing with the question of whether expert testimony could be received. The question there was whether the court could make its decision without an expert when the prevailing party failed to offer expert testimony. In this case, by contrast, the court permitted an expert to testify. Because the issue here is whether expert testimony *may* be permitted, not whether expert testimony *must* be offered, *Grace* is inapposite. Normally, a court should receive expert testimony if the requisite conditions have been met and the testimony will assist the trier of fact.

¶ 47. The court of appeals concluded that Dr. Althouse was not testifying as an expert when he stated that, in his opinion, Watson's false imprisonment of the victim was sexually motivated. The court stated that although it did not question Dr. Althouse's expert qualifications as a psychologist, not all his testimony was

expert testimony. *Watson*, No. 95–1067, slip op. at 6. We do not agree.

¶ 48. In this case, Dr. Althouse was qualified as an expert at the outset of the probable cause hearing. There was no dispute about his credentials. Dr. Althouse explained that he was a clinical psychologist who had been licensed to practice in Wisconsin for 17 years. His entire career had been spent in corrections working for the State of Wisconsin.

¶ 49. On the subject of Watson's sexual motivation for the false imprisonment, the assistant district attorney first attempted to solicit the psychologist's opinion as a lay witness. The defense counsel objected and the court agreed, saying: "Opinions of lay persons are limited to perception, things that they perceive and subject matters about which lay people can reasonably and commonly be expected to form opinions. There is no adequate foundation for a lay opinion."

¶ 50. After the court's ruling, the assistant district attorney rephrased the question, asking: "Doctor, based on your training, education, and experience, your conversations with Mr. Watson, your review of all the written materials that you testified to, did you form an opinion to a reasonable degree of psychological certainty as to whether Count 3 [false imprisonment] in Exhibit 1 was a. . .sexually motivated offense?"

¶ 51. After some dispute, Judge Bartell allowed Dr. Althouse to express his opinion as expert testimony. Over defense counsel's objection, Judge Bartell stated her ruling as follows:

THE COURT: It is my—this is a licensed clinical psychologist. It is my understanding that they study human behavior, that they study the sources of human behavior, that they participate in the clas-

sification and diagnosis of human behavior, and it is my opinion that the subject of motivations for human behavior is generally within the study of psychology, and I am going to take the objection to weight and permit cross examination, but I think since this is in the form of an expert opinion and it relates to conclusions about the behavior of Mr. Watson from a psychological viewpoint, that I will permit the opinion to be expressed on the record.

¶ 52. At the probable cause hearing and at trial, the trier of fact is required to determine whether the subject of a sexually violent person petition has been convicted of a sexually violent offense. When the offense is not a sexually violent offense per se under § 980.01(6)(a) or (c), the State must show that the person was "sexually motivated" in committing one of the enumerated offenses under § 980.01(6)(b). While the average lay person may be able to draw reasonable inferences from facts, an expert ought to be able to show how a person's offense relates to the person's purported mental disorder, explaining both consistencies and inconsistencies, interpreting the person's statements and explanations (many of which the fact finder will not have heard), and offering an analysis of whether there is a consistent pattern of conduct in the person's experience which reveals sexual motivation and intent. The average person is simply not prepared to expound on paraphilia or other sex-related mental disorders. An expert should be able to assist the fact finder in determining the nature and source of an offender's motivation. Judge Bartell understood this.

█

¶ 53. We conclude, under the standard of review outlined above, that Judge Bartell's decision to allow

the testimony and recognize it as expert testimony on the issue of sexual motivation was correct.

## V.

¶ 54. Next, we address whether expert testimony based in whole or in part on inadmissible evidence may itself be admitted into evidence.

¶ 55. Trial courts have wide discretion in admitting the opinion of an expert. *Kreyer v. Farmers Co-op Lumber Co.*, 18 Wis. 2d 67, 75, 117 N.W.2d 646 (1962). A circuit court's decision to admit or exclude expert testimony will not be upset on appeal if it has a reasonable basis and was made in accordance with accepted legal standards and in accordance with the facts of record. *State v. Weber*, 174 Wis. 2d 98, 106, 496 N.W.2d 762 (Ct. App. 1993).

¶ 56. Wisconsin Stat. § 907.03 provides:

> **Bases of opinion testimony by experts.** The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

This statute allows an expert to rely on inadmissible evidence if of a type reasonably relied upon by experts in the field in forming an opinion or inference.

¶ 57. The court of appeals stated that the PSI relied upon by Dr. Althouse "was not. . .the type of data or information reasonably relied upon in the formation of an expert opinion." *Watson*, No. 95–1067, slip op. at 7. We disagree.

191

¶ 58. Wisconsin Stat. § 972.15 authorizes presentence investigations. The statute dates back to the 1969 session of the legislature. Chapter 255, Acts of 1969. However, the preparation of presentence investigations long predates the statute. In fact, a legislative note accompanying the text of the 1969 Act observed that: "Most judges and attorneys will be surprised to learn that, outside of a provision for Milwaukee County (s. 57.02(6)), there is presently no statutory authority for presentence investigations. Wisconsin has been a pioneer in this field and obviously the presentence investigation is an integral part of the sentencing practice in this state." Legislative Council Note, 1969, Wis. Stat. Ann. § 972.15.

¶ 59. Under the version of the statutes in effect in 1995, "The person preparing the presentence investigation report shall attempt to contact the victim to determine the economic, physical and psychological effect of the crime on the victim. The person preparing the report may ask any appropriate person for information. This subsection does not preclude the person who prepares the report from including any information for the court concerning the impact of a crime on the victim." § 972.15(2m). This subsection was not part of the statute in 1980, but its substance was acted on by Agent Moore in preparing the PSI.

¶ 60. Subsection (5) of § 972.15 provides:

> The department may use the presentence investigation report for correctional programming, parole consideration or care and treatment of any person sentenced to imprisonment. . .or any other person in the custody of the department or for research purposes. The department may make the report available to other agencies or persons to use for purposes related to correctional programming,

parole consideration, care and treatment, or research. . . .

¶ 61. At the probable cause hearing, Dr. Althouse testified that prior to interviewing Watson, he reviewed materials in "the Bureau of Clinical Services confidential file, including the presentence report." That the PSI should be included in the Bureau of Clinical Services confidential file is not surprising inasmuch as § 972.15(5) specifically authorizes the department to use PSI reports for care and treatment and correctional programming.

¶ 62. Dr. Althouse testified that he relied on PSIs on a regular basis. The following exchange took place between Dr. Althouse and the Assistant District Attorney representing the State:

> Q: Have you seen a presentence like this before? I mean. . .[H]ave you seen presentences in general before?
>
> A: Yes.
>
> Q: And in your work do you rely on them?
>
> A: Yes.
>
> Q: Are these presentences kept in the corrections files in the ordinary and normal course of business?
>
> A: Yes.

¶ 63. The administrative rules governing the preparation of PSIs stress the need to present the sentencing court with accurate and relevant information. Wis. Admin. Code §§ DOC 328.27–328.29 and accompanying Appendix; *State v. Perez*, 170 Wis. 2d 130, 140 n.6, 487 N.W.2d 630 (Ct. App. 1992), *review denied*, 491 N.W.2d. 768 (1992), *cert. denied*, 506 U.S. 957 (1992).

"To safeguard the accuracy of the PSI, the probation and parole agent preparing the report must be neutral and independent of either the prosecution or defense. ...The PSI's author is acting exclusively on behalf of an independent judiciary." *Perez*, 170 Wis. 2d at 140–41.

¶ 64. We acknowledge that some of the information in a PSI may be unverified and some of it may be inaccurate. But affording the defendant and defendant's counsel an opportunity to examine the contents of the report permits the defendant to challenge statements and correct errors. The defendant is entitled to file his own presentence memorandum and to present testimony at the sentencing hearing.

■

¶ 65. In any event, there can be no question that professionals in corrections, including clinical psychologists, routinely and reasonably rely on presentence investigations to evaluate persons in the corrections system and to form opinions. Evidence is found in *Weber*, 174 Wis. 2d at 105 n.4, where the court noted that:

> Dr. Fosdal testified that his opinion was based upon the police reports generated from the 1984 incident, the transcripts of the phase one trial and the sentencing hearing, a brief 1990 interview with Weber, *the presentence investigation report*, Weber's correctional records, certain collateral clinical service records and treatment reports, and previous contacts with Weber. (Emphasis supplied.)

*See also State v. Zanelli*, 212 Wis. 2d 358, 569 N.W.2d 301 (Ct. App. 1997), *review denied*, 215 Wis. 2d 423 (1997), where Dr. Susan Curran and Dr. Ronald Sindberg reviewed Ronald Zanelli's medical and corrections records, including his PSIs, and later testified.

The court noted that "the PSI may contain information highly relevant to" a commitment proceeding. *Zanelli*, 212 Wis. 2d at 378.

¶ 66. This analysis leads to the admissibility of the expert's opinion. In *Kolpin v. Pioneer Power & Light*, 162 Wis. 2d 1, 37, 469 N.W.2d 595 (1991), we stated that "even if [the expert] arguably relied on hearsay in forming [the expert's] opinion, [the expert's] opinion is still admissible." *See also Weber*, 174 Wis. 2d at 108 ("the trial court correctly recognized that sec. 907.03, Stats. (1989–90), allowed [the expert] to offer an opinion based in part upon hearsay data that was otherwise inadmissible. . . ."); *State v. Mann*, 135 Wis. 2d 420, 427, 400 N.W.2d 489 (Ct. App. 1986)(expert opinion which relied on reports of others properly admitted as facts or data reasonably relied on by experts in field); *Liles v. Employers Mut. Ins.*, 126 Wis. 2d 492, 506, 377 N.W.2d 214 (Ct. App. 1985)("[The defendant]. . .could properly request [the expert] to give an opinion based on such facts presented to him at trial, even though those facts may have been inadmissible.").

■■

¶ 67. The statute authorizes the admission of an expert's opinion when it is based on information reasonably relied upon by experts in the particular field. This includes presentence investigations, even though the PSI upon which the opinion is based includes inadmissible hearsay.

## VI.

¶ 68. Having determined that Dr. Althouse properly testified as an expert at the probable cause hearing, that he reasonably relied on the contents of the PSI in forming his opinion, and that his opinion

testimony was admissible even though it was based in whole or in part on inadmissible hearsay, we must decide what weight the court was entitled to give his testimony. The ultimate question is whether the psychologist's opinion based on Watson's inadmissible hearsay statement was sufficient by itself to establish probable cause on the element that the predicate crime was sexually motivated.

¶ 69. In determining whether probable cause exists, an appellate court will accept the circuit court's findings of fact unless they are clearly erroneous but will review de novo whether the facts constitute probable cause. *See State v. Moats*, 156 Wis. 2d 74, 84, 457 N.W.2d 299 (1990).

¶ 70. The circuit court found that while Dr. Althouse's expert opinion was admissible in evidence, it should be given no weight. Judge Bartell declared that:

> The State has failed to show probable cause that the false imprisonment was sexually motivated. An expert opinion without a factual basis in evidence when the facts do not appear of record [is] not a part of the factual basis for the underlying offense. It is comparable to a hypothetical question where the facts have not been established. . . . The opinion has evidentiary weight only when it is based on facts that are established in the case.

¶ 71. The essence of the circuit court's decision was that the expert's opinion was based *solely* on the statement "Now you're gonna suck me off, bitch. Now you're gonna suck me off" and that that statement was inadmissible hearsay.

¶ 72. At the outset of his testimony, Dr. Althouse established his professional credentials and noted all

the materials he studied before spending a total of two and one-half hours interviewing Watson. He thereafter gave his opinion on Watson's mental disorder, his dangerousness, the substantial probability of his reoffending, and the sexual motivation for the second false imprisonment charge. Each question posed by the State asked Dr. Althouse if he had formed an opinion based on his experience, the Watson interviews, and all the materials he had studied.

¶ 73. During direct examination, Dr. Althouse said in response to a question about the sexual nature of the false imprisonment offense:

> The statement that I relied upon which I believe you are asking about to form *in part* the basis of my opinion, is this: "Now you are going to suck me off, bitch. Now you are going to suck me off, he says." (Emphasis supplied.)

¶ 74. On cross examination, Dr. Althouse was asked:

Q: Now, as I understand it, your opinion as to sexual motivation for the false imprisonment in 1980 rests entirely on this one statement?

A: Yes.

¶ 75. Judge Bartell's extensive examination of Dr. Althouse included the following questions:

Q: You indicated that you relied on the statement attributed to Mr. Watson which [Victim II] has reported in the presentence investigation, is that correct?

A: Yes.

197

Q: Does your opinion depend on or assume that
 Mr. Watson made that statement to [Victim
 II]?

A: Yes.

¶ 76. On re-cross, Dr. Althouse was asked:

Q: Sort of along the same line that the Judge
 was asking you, assuming that statement
 wasn't made, would that change your opinion
 that the false imprisonment charge was sex-
 ually motivated if all you had was the rest of
 the information about the beating. . .?

A: If I didn't have that statement, it would be
 virtually impossible to draw that conclusion.

Q: And that is because the list of the facts out-
 lined don't suggest a sexual—I mean, there is
 not a sexual touching or any other attempt, is
 that correct?

A: That is correct.

¶ 77. Wisconsin Stat. § 907.03 is not a hearsay
exception. In *Kolpin*, 162 Wis. 2d at 37 n.10, this court
stated that "Section 907.03, Stats., . . . is not to be
confused with a 'hearsay exception.' To do so would be
to say the hearsay is admissible and can be used by any
witness for the truth of the matter asserted." In *Weber*,
174 Wis. 2d at 106–107, the court of appeals said:

Section 907.03 allows an expert to base an opinion
upon data that constitute hearsay if the data are of
a type reasonably relied upon. . . .However, sec.
907.03 is not a hearsay exception. . . .Hearsay data
upon which the expert's opinion is predicated may
not be automatically admitted into evidence by the
proponent and used for the truth of the matter

198

asserted unless the data are otherwise admissible under a recognized exception to the hearsay rule.

¶ 78. Section 907.03 does not transform inadmissible hearsay into admissible hearsay. It does not permit hearsay evidence to come in through the front door of direct examination.

¶ 79. The danger in permitting inadmissible hearsay to serve as the basis for expert opinions is that hearsay may reach the trier of fact through "the back door" of cross-examination if experts are asked to explain the bases for their opinions. Professor Daniel Blinka of Marquette University Law School has pondered this dilemma in a scholarly article discussing Federal Rule of Evidence 703, which is the model for Wis. Stat. § 907.03. Professor Blinka writes:

> What should be done with the experts' inadmissible bases? Does the experts' reliance validate the otherwise inadmissible information, thereby transforming it into admissible evidence? Conversely, should the court bar any mention of the tainted bases while permitting only the expert's testimony about the opinion? Or should the judge instruct the jury to consider the inadmissible bases for whatever bearing they have on the cogency of the expert's opinion testimony, but not for any other purpose? If the judge elects the latter course, what exactly does such an instruction mean? And if such limiting instructions are meaningless, is Rule 703 [§ 907.03] a device that allows a party to simply parade inadmissible evidence before the jury in direct contravention of the exclusionary rules?

Daniel D. Blinka, *"Practical Inconvenience" or Conceptual Confusion: The Common-Law Genesis of Federal Rule of Evidence 703*, 20 Am. J. Trial Advoc. 467, 468

(1997). *See also* 7 D. BLINKA, WISCONSIN PRACTICE - EVIDENCE Sec. 703.4 (1991).

¶ 80. Judge Bartell confronted this dilemma by receiving the expert opinion but giving it no weight. She compared the opinion to an expert's response to a hypothetical question. Wisconsin JI-Criminal 205 explains hypothetical questions as follows:

> During the trial, an expert witness was told to assume that certain facts were true and then was asked for an opinion based upon those assumptions. This is called a hypothetical question. Such an opinion should be considered only to the extent that the assumed facts upon which it is based are true and correct. Such an opinion does not establish the truth of the facts upon which it is based. If you find that the facts stated in the hypothetical question have not been proved, then the opinion based thereon is not to be given any weight.

¶ 81. This instruction is grounded on well established law. *McGaw v. Wassmann*, 263 Wis. 486, 57 N.W.2d 920 (1953). "If counsel chooses to ask an expert for an opinion based upon a hypothetical set of facts, 'the question must be based on assumptions that have some support in the evidence.' " *Prahl v. Brosamle*, 98 Wis. 2d 130, 157, 295 N.W.2d 768 (Ct. App. 1980) (quoting *Schulz v. St. Mary's Hospital*, 81 Wis. 2d 638, 652, 260 N.W.2d 783 (1978), citing *Kreyer v. Farmers Co-op Lumber Co.*, 18 Wis. 2d 67, 117 N.W.2d 646 (1962)).

¶ 82. Wisconsin Stat. § 907.03 is an evidentiary rule which applies in both civil and criminal contexts. A circuit judge administering this rule must be given latitude to determine when the underlying hearsay may be permitted to reach the trier of fact through examination of the expert—with cautioning instructions for the trier of fact to head off

200

misunderstanding—and when it must be rigorously excluded altogether. In the end, the trier of fact must understand its authority to disregard or devalue the expert's opinion if it is not based on evidence of record.

¶ 83. These issues become especially critical in criminal proceedings and proceedings such as commitments under Chapter 980 where a person's statutory or constitutional rights must be vindicated.

■

¶ 84. The purpose of a probable cause hearing in a sexually violent person commitment is to show that there is a substantial basis for going forward with the commitment, when it is virtually certain that if probable cause is found, the person will remain in custody until the completion of the proceeding, even if the person has fully satisfied the requirements of his or her criminal sentence. Hence, the probable cause hearing serves as a barrier to improvident or insubstantial commitment petitions which are not likely to succeed on the merits.

■

¶ 85. A probable cause hearing under Chapter 980 is similar to a preliminary examination in a felony case which is designed to prevent "hasty, improvident or malicious prosecution" and "to discover whether there is substantial basis for bringing the prosecution and further denying the accused his right to liberty." *State v. Copening*, 103 Wis. 2d 564, 578, 309 N.W.2d 850 (Ct. App. 1981). A probable cause hearing is also similar to a probable cause hearing for an involuntary mental commitment under Chapter 51, and we note that the rules governing preliminary examinations apply in Chapter 51 hearings. Therefore, we conclude that the rules governing preliminary hearings in felony

prosecutions also apply to probable cause hearings under Chapter 980.

¶ 86. The rules of evidence apply to probable cause hearings under Chapter 980. By analogy, the exceptions to the rules that have been crafted for preliminary examinations also apply in probable cause hearings. *See* Wis. Stat. § 970.03(11) and (12).

¶ 87. Judge Bartell was not in a position to disregard valid hearsay objections at Watson's probable cause hearing. She correctly applied both statutory and case law.

¶ 88. The State contended in oral argument that even at trial, Watson's hearsay statement could be used without substantiation. We disagree. At trial in a sexually violent person commitment, the subject of the petition has a statutory right to cross-examine witnesses. Wis. Stat. § 980.03(2)(c). In some circumstances, this right becomes a constitutional right to confront witnesses. Wis. Stat. § 980.05(1m). "It has long been conceded 'that hearsay rules and the Confrontation Clause [of the Sixth Amendment] are generally designed to protect similar values.'" *Hagenkord v. State*, 100 Wis. 2d 452, 471, 302 N.W.2d 421 (1981)(quoting *California v. Green*, 399 U.S. 149, 155 (1970)).

¶ 89. In *Dutton v. Evans*, 400 U.S. 74, 89 (1970), the United States Supreme Court stated:

> The decisions of this Court make it clear that the mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that "the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement."

¶ 90. The concern that inadmissible hearsay—coming in through "the back door"—may violate a defendant's constitutional right to confrontation underscores our recognition that the trial court must be given latitude in responding both to expert opinions and to the bases for those opinions when the bases involve inadmissible hearsay. It was not error for the circuit court to conclude that a clinical psychologist's opinion based solely on inadmissible hearsay evidence did not constitute probable cause that Watson's false imprisonment was sexually motivated.

## VII.

¶ 91. In reviewing the decisions below, the court has carefully examined the evidentiary record in this case. We have determined as a legal principle that the expert opinion of Dr. Richard Althouse, to the extent that it relies *solely* on inadmissible hearsay for its basis, does not support probable cause on the element that the predicate offense of false imprisonment was "sexually motivated."

¶ 92. In upholding that finding of the circuit court, this court is put in the awkward position of supporting the proposition that Dr. Althouse based his entire opinion about the sexual motivation of the false imprisonment of Victim II on two sentences on page 6 of the 14-page presentence investigation report; that he disregarded everything else in the report, including Watson's lengthy criminal record of repeated attacks on young women and his conviction in 1971 for attempted rape; that his interviews with Watson, including Watson's rationalizations for his conduct, revealed nothing about his motivation for the crime; and that his own diagnosis that Watson had the sexual

disorder paraphilia had no bearing on the motivation for the offense.

¶ 93. It is fundamental, however, that the determination whether the State has established probable cause is a determination for the court, not the expert. We are convinced, after reviewing the evidentiary record, that the State succeeded in establishing probable cause on each of the four required elements at the April 7, 1995, probable cause hearing.

¶ 94. In *State v. Dunn*, 121 Wis. 2d 389, 359 N.W.2d 151 (1984), this court examined the quantum of evidence necessary at a preliminary hearing to establish probable cause. The court compared different standards of probable cause at different stages of the criminal process, from probable cause to search to probable cause for arrest to probable cause for a bindover at a preliminary examination. *Id.* at 396–97. We also noted that a preliminary examination is intended to be a summary proceeding for the purpose of determining whether there is a reasonable probability that the defendant committed a felony and thus a substantial basis for bringing the prosecution. *Id.* at 397. A preliminary examination is not a preliminary trial or a full evidentiary trial on the issue of guilt beyond a reasonable doubt. *Id.* at 396. It is intended to be a summary proceeding to determine essential or basic facts as to probability, where the examining judge is "concerned with the practical and nontechnical probabilities of everyday life in determining whether there is a substantial basis for bringing the prosecution and further denying the accused his right to liberty." *Id.* at 396–97.

¶ 95. In *Dunn*, this court stressed that the judge at a preliminary examination must ascertain the plausibility of a witness's story and whether, if believed, it

would support a bindover. *Id.* at 397. The judge cannot delve into the credibility of a witness. *Id.*

¶ 96. The court concluded:

> The focus of the judge at a preliminary hearing is to ascertain whether the facts and the reasonable inferences drawn therefrom support the conclusion that the defendant probably committed a felony. If inferences must be drawn from undisputed facts, as in this case, only reasonable inferences can be drawn. We stress that a preliminary hearing is not a proper forum to choose between conflicting facts or inferences. . . .If the hearing judge determines after hearing the evidence that a reasonable inference supports the probable cause determination, the judge should bind the defendant over for trial. Simply stated, probable cause at a preliminary hearing is satisfied when there exists a believable or plausible account of the defendant's commission of a felony.

*Id.* at 397–98.

¶ 97. These same principles apply at a probable cause hearing under § 980.04. The probable cause hearing is not a trial; it is a summary proceeding in which the State must establish a plausible account on each of the required elements to assure the court that there is a substantial basis for the petition. In determining whether probable cause has been established, an examining judge must recognize that the State is entitled, in meeting its burden, to rely on all reasonable inferences that can be drawn from the facts in evidence.[13]

---

[13] "Requiring an examining judge to bind a defendant over for trial when there exists a set of facts that supports a reasonable inference that the defendant probably committed a felony sufficiently satisfies the purpose for preliminary hearings, *i.e.*,

¶ 98. At the probable cause hearing in this case, Dr. Althouse never stated that his opinion on Watson's mental disorder, his dangerousness, and his substantial probability of re-offending depended *solely* on Watson's uncorroborated statement to Victim II. Dr. Althouse was asked by the court whether the elimination of the Watson statement would affect his opinion on Watson's dangerousness and his likelihood of re-offending. He forthrightly acknowledged that the *strength* of his opinions would be reduced. Asked if the elimination of the statement would affect his opinion about the diagnosis of paraphilia, Dr. Althouse replied: "I don't think so."

¶ 99. Dr. Althouse explained to the court his completion of the Hare psychopathy checklist in which he evaluated Watson as having "primary psychopathy"—a serious anti-social personality disorder. He said:

> There has been a bit of research that has indicated that the Hare—scores on the Hare are predictive of sexual recidivism among sexual offenders.

¶ 100. In response to questions by defense counsel about Watson's possible placement with the Attic correctional service in Madison, Dr. Althouse stated: "I know they have a sex offender treatment program," an answer which appeared to satisfy Watson's counsel.

¶ 101. Many of the documents examined by Dr. Althouse to form his opinions were made a part of the record.

---

that the accused is not being prosecuted too hastily, improvidently, or maliciously and that there exists a substantial basis for bringing the prosecution." *State v. Dunn*, 121 Wis. 2d 389, 398, 359 N.W.2d 151 (1984).

¶ 102. Exhibit 1 is a copy of the Judgment of the four convictions in 1980, including a reference to a prior offense.

¶ 103. Exhibit 2 consists of numerous documents including an amended petition which contained a listing of Watson's criminal convictions; a copy of the presentence investigation report which listed Watson's criminal convictions; a copy of the 1980 criminal complaint; and a copy of the transcript of the 1980 sentencing hearing, in which there are specific references by the circuit court and others to Watson's criminal convictions.

¶ 104. Exhibit 5 is a sample of the Hare psychopathy checklist.

¶ 105. Exhibit 6 is a two-page excerpt from the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994).

¶ 106. The criminal complaint, outlining the offenses committed on January 21, 1980, was not only part of Exhibit 2, but also repeatedly discussed in testimony and marked with a yellow marker at the request of the court. The assistant district attorney asked the court to take judicial notice of the complaint, and defense counsel replied: "The criminal complaint, that has been actually testified about. I don't object to that." Hearing Tr. at p. 49.

¶ 107. The criminal complaint was the document which served as the factual basis for Watson's prosecution and plea in 1980. It is the document which provided the foundation for the Judgment in Exhibit 1. Watson never asked for a preliminary examination in 1980. In his interviews with Dr. Althouse, Watson did not challenge any of the essential details of the complaint, nor did his counsel challenge the accuracy of the complaint at the probable cause hearing. Dr. Althouse

testified explicitly that he considered the facts of the 1980 incident—derived from the complaint—in forming his opinion on Watson's sexual motivation.

¶ 108. Had Watson's predicate offense been a per se offense under § 980.01(6)(a) or (6)(c), the entry into evidence of a judgment of conviction would have satisfied the requirement that the defendant had been convicted of a sexually violent offense. When the predicate offense is one of the crimes listed in § 980.01(6)(b), the State is required to show that the commission of the crime was sexually motivated. If the defendant had successfully objected to the court's taking judicial notice of the complaint, the State might have been required to produce a witness or a transcript of the plea hearing (or a preliminary hearing transcript, if there had been a preliminary examination). "Judicial notice is simply a process whereby one party is relieved of the burden of producing evidence to prove a certain fact." *State v. Barnes*, 52 Wis. 2d 82, 86, 187 N.W.2d 845 (1971).

¶ 109. The assistant district attorney also asked the court to take judicial notice of the sentencing transcript. The assistant district attorney said: "I want the court to take judicial notice of the whole transcript. . . .I am offering it to support the burden that I have at this proceeding." The court agreed to take judicial notice of pages 30 and 31 of the transcript.

¶ 110. Watson's past criminal convictions were discussed repeatedly by Dr. Althouse, often in response to questions from defense counsel. They were also discussed in the sentencing transcript from 1980. Dr. Althouse discussed Watson's conviction for carnal knowledge and abuse of a child and said that Watson admitted to a sexual motivation. Defense counsel suggested that "the girl in that situation wasn't blameless

and it seemed to be less one-sided than the conviction suggested."

¶ 111. Watson was convicted of carnal knowledge and abuse in 1953, under then Wis. Stat. § 340.47 (1953–54), which provided: "Any person over eighteen years of age who shall unlawfully and carnally know and abuse any female under the age of eighteen years shall be punished by imprisonment. . . ." The details of the conviction are not evident in the probable cause record, but we recognize that in 1953, Watson was more than 30 years of age while his victim was under 18 years of age.

¶ 112. In 1972, Watson was convicted of attempted rape and two counts of endangering safety by conduct regardless of life for an incident in 1971. Attempted rape is a per se offense under § 980.01(6)(c). In his dissenting opinion in the court of appeals, Judge Dykman described this incident as follows:

> [I]n 1971, Watson picked up three women in Milwaukee and was driving them to Algoma. He forced the women to disrobe by threatening them with a knife and attempted to tape together the hands of one of them. He disrobed and crawled into the back seat of his car, where he attempted to have sexual intercourse with one of the women. The women successfully fled the vehicle.

*Watson*, 95–1067, slip op. at 4 (Dykman, J., dissenting).

¶ 113. The attempted rape charge was the subject of repeated questions to Dr. Althouse. Dr. Althouse testified that in his interviews with Watson, Watson admitted the incident but "basically denied attempting to rape the victim as charged and attempted to describe what happened in that incident as a joke that apparently went too far." Although Watson denied to Dr.

209

Althouse that any of his conduct was sexually motivated, Watson's conviction of attempted rape is undisputed.

¶ 114. Judge Bartell commented on this incident in the 1980 sentencing hearing. She stated:

> The third conviction which is significant for the Court's consideration is one out of Manitowoc, Wisconsin, on March 28, 1971, for an incident which arose in March of 1971 involving three coeds from the University of Wisconsin. Convictions were for endangering safety by conduct regardless of life, two counts, and one count of attempted rape. It involved Mr. Watson's conduct where he picked up three coeds, forced them to disrobe at knife point, and attempted to sexually assault one of the three. All three of the young women escaped ultimately. *The similarity of that conduct to the conduct the defendant is convicted of here in Dane County in 1980,* with picking up two young women hitchhikers and detaining them in violation of the criminal law and assaulting them in the fashion which resulted in his conviction for battery and endangering safety by conduct regardless of human life, *is striking.* (Emphasis supplied.)

¶ 115. Watson's other convictions of note are discussed in the sentencing transcript which the State asked the court to consider. Watson's conviction for burglary and battery in a 1969 incident is discussed on page 31 of the sentencing hearing transcript. The court summarized the incident as burglary and battery in a burglarized enclosure which "involved the entry of a home of a woman who was sleeping." The court indicated that Watson had attacked the woman with "some hatchet-type instrument, striking the woman on the head at least six or eight times" while she was in bed.

¶ 116. Watson admitted to Dr. Althouse the sexual motivation in the 1953 offense. The sexual motivation in the 1971 conviction involving young women hitchhikers, knives, and tape is obvious. The 1980 incidents also involved young women hitchhikers, knives, and tape. They also involved a hammer, not dissimilar to the "hatchet-type instrument" with which Watson battered a woman after he invaded her home and jumped on her in bed. The clinical psychologist testified that in his expert opinion Watson was suffering from paraphilia—"a condition that results in urges, uncontrollable urges, that involves sexual contact with non-consenting partners." The technical description of paraphilia set out in the record includes Sexual Sadism.

¶ 117. In 1980, Watson falsely imprisoned and beat two young women with a hammer within an hour's time. What was his motivation for these offenses?

¶ 118. The State was entitled to all reasonable inferences from facts in the evidentiary record to support its theory of the crime.

¶ 119. We think the totality of the evidence constituted a plausible case that Watson's unprovoked hammer attack on Victim II in 1980 was "sexually motivated." The totality of the evidence includes Dr. Althouse's opinions on Watson's mental disorder, his dangerousness, and the substantial probability of his reoffending. This court cannot help but note that regardless of the basis for Dr. Althouse's opinion on "sexual motivation," his other opinions, together with Watson's pattern of prior criminal offenses, supports a finding of probable cause.

¶ 120. When the issue before this court is whether the State has adduced sufficient evidence at a preliminary hearing or a probable cause hearing to establish probable cause, the case presents a legal issue, and we review the record de novo to determine whether the evidence constitutes probable cause. *See Moats*, 156 Wis. 2d at 84.

¶ 121. In our view, the evidence presented at the probable cause hearing and the reasonable inferences drawn from that evidence constitute probable cause as a matter of law. Consequently, on the authority of *Wittke v. State ex rel. Smith*, 80 Wis. 2d 332, 259 N.W.2d 515 (1977); *State v. Dunn*, 121 Wis. 2d 389; and *State v. Fry*, 129 Wis. 2d 301, 385 N.W.2d 196 (Ct. App. 1985), *review denied*, 129 Wis. 2d 550 (1986), the decision of the court of appeals affirming the circuit court's order dismissing the petition is reversed and the cause is remanded to the circuit court for further proceedings.

*By the Court.*—The decision of the court of appeals is reversed and the cause remanded.

¶ 122. DONALD W. STEINMETZ, J., did not participate.