STATE of Wisconsin, Plaintiff-Respondent,

v.

Juan MARES, Defendant-Appellant.†

Court of Appeals

*No. 88–1530–CR. Submitted on briefs January 31, 1989.—*
*Decided March 1, 1989.*

(Also reported in 439 N.W.2d 146.)

† Petition to review denied.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *William J. Tyroler,* assistant state public defender.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Donald J. Hanaway,* attorney general, and *James M. Freimuth,* assistant attorney general.

Before Scott, C.J., Brown, P.J., and Nettesheim, J.

NETTESHEIM, J.   Juan Mares appeals from a judgment convicting him of four counts of second-degree sexual assault, contrary to sec. 940.225(2)(e),

Stats.[1] He contends that the trial court erroneously admitted substantive evidence of prior consistent statements made by two of the state's witnesses. Mares also argues that the trial court improperly allowed the state to inquire into concerns of the victim's sisters because of Mares' actions intruding on their privacy. Finally, when the court precluded any further testimony on this subject, Mares argues that the prosecutor committed misconduct by flouting the ruling.

We conclude that because Mares implied that two of the state's witnesses had been improperly influenced and had recently fabricated portions of their testimony, their prior consistent statements were properly admitted for substantive purposes under sec. 908.01(4)(a)2, Stats. We also conclude that the trial court properly allowed inquiry into the other girls' concerns about Mares' actions intruding on their privacy since the defense had opened the door to this inquiry on cross-examination. Furthermore, we conclude that the prosecutor's subsequent questions were proper and within the limits of the trial court's ruling. Therefore, we affirm the judgment.

At trial, the victim, M.E., testified to the sexual assaults alleged in the information. She stated that Mares had sexual contact with her on two occasions while she was living in Racine; once after she had fallen asleep on her mother's bed, and another time while she was pretending to sleep on the living room couch. Mares was her mother's boyfriend, and he lived with M.E. and her mother. M.E. also testified to prior, uncharged sexual contact involving Mares which occurred when he was living with M.E. and her mother in California. M.E.

---

[1]Section 940.225(2)(e), Stats. (1987–88), is repealed and recreated effective July 1, 1989. Secs. 30, 55, 1987 Wis. Act 332.

stated that Mares had touched her and her cousin, K.W., sexually, that they told M.E.'s mother about the touchings, and that they then barred the door to their bedroom with a knife so that Mares could not get in.

On cross-examination, Mares impeached M.E. with her preliminary hearing testimony in which she had attributed the details of the assault on the bed to the assault on the couch, and vice versa. Mares then implied, both on cross- and recross-examination, that the prosecutor had influenced M.E.'s trial testimony. Although the preliminary hearing had been limited to the Racine events, Mares also brought up M.E.'s preliminary hearing statement that she never told her mother about the events until after the matter was reported to the police. This implied to the jury that M.E. was also fabricating when she stated that while in California she had told her mother about the touchings that occurred there.

The state's next witness, Dr. Mary Welch, testified to an earlier consistent statement M.E. made to her during a counseling session. This session took place two months after M.E. had reported the assaults to the police and ten months before the preliminary hearing. Dr. Welch's brief testimony revealed that M.E. had told her about the sexual contact in California and that she had tried to tell her mother about the contact while still in California. M.E. also told Dr. Welch that Mares had "fondled her and then raped her" in Racine and that she did not tell her mother because she did not think she would be believed.

Mares objected to Dr. Welch's testimony on hearsay grounds. The state responded that because Mares had brought up all the inconsistencies between M.E.'s preliminary hearing and trial testimony and implied that she was lying at trial, the prior statement M.E. had

made to Dr. Welch was admissible under sec. 908.01(4)(a)2, Stats., as a prior consistent statement. The trial court agreed to the admissibility of Dr. Welch's testimony under sec. 908.01(4)(a)2, finding that it rebutted Mares' implication that M.E. had a motive to lie. The court also denied Mares' request for a limiting instruction to the jury, ruling that the statement could come in substantively.

The state next called K.W. as a witness. On cross-examination, Mares implied that K.W. had been improperly influenced by talking to M.E. three days before trial. The state then called the investigating officer, Barbara Munoz, to testify about an earlier consistent statement that K.W. made to her during the investigation of the assaults nearly a year and a half earlier. Again, Mares objected on hearsay grounds. The court overruled the objection, and Munoz' corroborating testimony was brought in substantively.

M.E.'s mother, Victoria, also testified for the state. On cross-examination, Mares elicited her testimony that in California M.E.'s sisters, JoJo and Patty, had also put a knife in their bedroom door because of "privacy problems" they were experiencing. Mares objected to the state's inquiry on redirect as to what these "privacy problems" were. The trial court overruled the objection, and the state elicited testimony that the girls did not like Mares coming into their room whenever he felt like it. At this point, however, the court precluded the state from bringing in any further evidence on this topic. The state, however, asked two further questions along these lines without objection from Mares. Mares was convicted of four counts of second-degree sexual assault. He appeals the trial court's denial of his three evidentiary objections.

■Generally, a question regarding the admissibility of evidence presents a matter of trial court discretion. *State v. Stinson,* 134 Wis. 2d 224, 232, 397 N.W.2d 136, 139 (Ct. App. 1986). An abuse of discretion can occur if it is premised upon an error in the appropriate and applicable law. *Thorpe v. Thorpe,* 108 Wis. 2d 189, 195, 321 N.W.2d 237, 240 (1982). Whether M.E.'s and K.W.'s statements fall within the hearsay exception of sec. 908.01(4)(a)2, Stats., presents a question of statutory interpretation. This is a question of law to which we apply an independent standard of review. *State v. Gavigan,* 122 Wis. 2d 389, 391, 362 N.W.2d 162, 164 (Ct. App. 1984).

Section 908.01(4)(a)2, Stats., reads in relevant part:

(4) STATEMENTS WHICH ARE NOT HEARSAY. A statement is not hearsay if:

(a) *Prior statement by witness.* The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:

. . . .

2. Consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive.

■It is undisputed that a prior consistent statement of a witness is not hearsay and may be offered for substantive purposes if the requirements of sec. 908.01(4)(a)2, Stats., are met. *State v. Gershon,* 114 Wis. 2d 8, 11, 337 N.W.2d 460, 461 (Ct. App. 1983). Section 908.01(4)(a)2 requires that: (1) the declarant testify at trial and be subject to cross-examination concerning the statement; (2) the statement is consis-

tent with the declarant's testimony; and (3) the statement rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive. *See Gershon,* 114 Wis. 2d at 10–11, 337 N.W.2d at 461. Neither Mares nor the state disagrees that the first two requirements were met by both M.E. and K.W. in this case. The issue in this case involves the third requirement, that the prior statement rebut an express or implied charge of recent fabrication or improper influence or motive.

Mares' argument is that the statements are not *prior* because M.E. and K.W. harbored earlier motives to lie about Mares' activities. Thus, Mares reasons that the motives—not the statements—are prior and therefore the evidence is inadmissible under sec. 908.01(4)(a)2, Stats. Mares supports this argument with references to his cross-examination of M.E. and K.W. Mares elicited testimony from M.E. that he had beaten her on the day that she was allegedly assaulted on the couch. K.W. testified that Mares had beaten her when they were living in California. Both girls stated that they had originally liked Mares, but after he had sexually molested them in California they no longer liked him. Therefore, Mares argues that both M.E. and K.W. had a motive to lie which *predated* their statements to the counselor and police investigator. As such, Mares contends that these *later* statements are not admissible to rebut the preexisting motive to falsify.

Section 908.01(4)(a)2, Stats., recognizes three "rebuttal" situations in which a prior consistent statement can be used: (1) recent fabrication; (2) improper influence; and (3) motive. Mares' argument invokes the last of these, arguing that M.E. and K.W. harbored a *prior* motive to lie about him based upon the physical and

sexual assaults. Even if we accept this premise, Mares overlooks that this case also presents the other two circumstances recognized by the statute, a charge of recent fabrication and improper influence. Mares' own cross-examination implied that the girls had recently fabricated their testimony because of their "collaboration" with the prosecutor and each other after the preliminary hearing. This evidence also implied that the witnesses' testimony had been improperly influenced. Since both M.E.'s and K.W.'s statements preceded the events of alleged fabrication and improper influence, we conclude that the statements were properly admitted as prior consistent statements for the truth of the matters asserted therein.[2] Sec. 908.01(4)(a)2.

As to M.E., Mares asserts that he never implied at trial that the prosecutor had improperly influenced M.E.'s testimony, or that M.E. had recently fabricated any part of her trial testimony. The state disputes this and points out that on both cross- and recross-examination of M.E., Mares suggested that she had been coached by the prosecutor as to how to explain the differences between her preliminary hearing and trial testimony. The record supports the state's interpretation.[3]

---

[2]We are not bound by the trial court's determination that the statements were admissible to rebut motive to falsify. If the trial court reached the correct result for the wrong reason we may affirm. *State v. Baudhuin,* 141 Wis. 2d 642, 648, 416 N.W.2d 60, 62 (1987).

[3]On cross-examination, the following exchange between defense counsel and M.E. occurred:

> Q. Has anyone told you that the version you gave at the preliminary hearing was different from the version you gave Investigator Munoz?
>
> A. Yes.
>
> Q. Who told you that?

This line of questioning by Mares clearly raised the spectre of improper prosecutorial coaching of M.E. and

A. Lennie [referring to Lennie Weber, the prosecutor].

Q. The attorney here?

A. Yes.

Q. Did she give you the police reports and the preliminary hearing [transcript] to read then?

A. Yes.

Q. Did she tell you to say that you were confused at the preliminary hearing?

A. No.

Q. These answers are all your answers?

A. Yes.

Q. No answers were suggested to you?

A. No.

On recross-examination, the further exchange occurred:

Q. At the preliminary hearing you were asked if you knew what the truth was, weren't you?

A. Yes.

Q. And you said that you knew and that you were going to tell the truth, didn't you?

A. Yes.

Q. And are you telling us today that you didn't realize that the mistakes that you made at the preliminary hearing you didn't realize until just this week?

A. Well, when I was done with the preliminary hearing, about a week later, that's when I got it all straight because they kept on asking questions, and I was just getting confused.

Q. So about a week later you knew that you made some mistakes in your testimony?

A. Yes.

Q. Who did you tell about these mistakes?

A. I told my mother.

Q. Anyone else?

A. Then when we went to go see Lennie I told her.

Q. That was this week?

suggested that M.E. was fabricating different testimony at trial. Furthermore, Mares implied that M.E. had recently fabricated that part of her trial testimony in which she stated that while in California she told her mother about Mares touching her sexually. Mares' counsel read part of M.E.'s preliminary hearing testimony to the jury which indicated that M.E. never told her mother about any of the events until after the police interview in Racine. The prosecutor interjected that the preliminary hearing did not cover the California events. However, by then Mares had already implied in the jury's presence that M.E. never told her mother about any of Mares' actions, and that for trial she fabricated the story that she had told her mother in California, but that her mother did not want to do anything about it.

M.E.'s statement to Dr. Welch was made prior to her having any contact with the prosecutor, and prior to her testimony at the preliminary hearing. Therefore, we conclude that the statement was properly admitted as an exception to the hearsay rule, since it rebutted Mares' charge of improper influence and recent fabrication. *See Gershon,* 114 Wis. 2d at 11, 337 N.W.2d at 461.

As to K.W., Mares implied that she had been improperly influenced by talking to M.E. three days before trial and by speaking with other witnesses between a *Whitty* hearing and trial. At the *Whitty* hearing, K.W. testified that while she was in California she did not tell M.E.'s mother about Mares' actions.

A. Yeah, I told her this week.

Q. You volunteered that—that you made mistakes or did she point that out to you?

A. Well, I volunteered and she pointed out the mistakes I made.

[Defense Counsel]: Nothing further.

Then, at trial, K.W. testified that she had, in fact, told M.E.'s mother while in California. Earlier, Mares had implied that M.E. had just fabricated this same piece of information for trial. On recross-examination of K.W., Mares asked her whether prior to trial the prosecutor told K.W. that she would be testifying to the California events, and whether she talked to M.E. about it recently. K.W. admitted that she had just talked to M.E. three days before, but that they did not discuss the California events. Despite K.W.'s answers, Mares' implication was that K.W. had recently fabricated part of her testimony so that it would mesh with M.E.'s testimony. K.W. made her consistent statement to Munoz prior to both the *Whitty* hearing and trial. Therefore, we conclude that the statement is admissible as an exception to the hearsay rule pursuant to sec. 908.01(4)(a)2, Stats.[4]

---

[4]The state confesses "probable" error in the trial court's ruling that K.W.'s statement was admissible as a prior consistent statement pursuant to sec. 908.01(4)(a)2, Stats. The state concludes that "[t]he only *clear* defense accusation of improper motive against [K.W.] concerned defendant's beating of [K.W.] in California." (Emphasis added.) We are not bound to accept the state's confession of error as to matters of law. *See State v. Gomaz,* 141 Wis. 2d 302, 307, 414 N.W.2d 626, 629 (1987). The issue in this case is the statutory construction of the prior consistent statement statute, sec. 908.01(4)(a)2. This presents a question of law. *State v. Gavigan,* 122 Wis. 2d 389, 391, 362 N.W.2d 162, 164 (Ct. App. 1984).

Our reading of the entire record compels us to reject the state's confession of error. As with M.E., K.W. was impeached at trial with the inconsistencies between her *Whitty* testimony and her trial testimony. Her admitted conversations with M.E. about the case before trial and the accusations that she had talked with others between the *Whitty* hearing and the trial date raise the implication of recent fabrication or improper influence. Thus, we see the impugning of K.W.'s credibility as similar to that of M.E.'s. We do

Next, Mares complains that M.E.'s mother, Victoria, was allowed to testify as to her other two daughters' concerns about Mares' invasion of their privacy when they lived in California. However, it was Mares' own cross-examination of Victoria that opened the door to this line of inquiry. Therefore, the trial court properly allowed the prosecutor to ask limited follow-up questions.

On cross-examination, Mares inquired whether Victoria was aware of K.W. putting a knife in the door of her bedroom in California. Victoria responded that it was not K.W. who did that, but rather two of her daughters, JoJo and Patty. Mares further pursued this line of questioning by asking if the girls did that so they could smoke, and Victoria stated that they "were doing that for their own privacy." On redirect-examination, the state followed up on this last question, asking what kind of "privacy problems" JoJo and Patty were having. Mares objected, and the trial court overruled the objection. Victoria testified that they did not like Mares coming in and out of their room whenever he felt like it.

In essence, Mares' argument is that since he did not expect the answers Victoria gave to his questions, the prosecution should have been precluded from taking advantage of the line of questioning which Mares himself had initiated. We are not aware of any statute or case law that would support Mares' position. Accordingly, we affirm the trial court's ruling.

Last, Mares apparently alleges that the prosecutor committed misconduct. After the prosecutor had prop-

---

not see the logic or consistency of the state's differing position with respect to M.E. and K.W. on this question.

erly elicited the testimony from Victoria that JoJo and Patty did not like Mares coming in and out of their room, she asked Victoria why they did not like it. Mares objected to this "why" question, and the trial court sustained the objection, stating that enough *Whitty* evidence had been introduced. The next questions the prosecutor then asked Victoria are the subject of Mares' claim of prosecutorial misconduct. The disputed exchange is as follows:

> Q. Is it possible that without your knowledge, [M.E.] and [K.W.] started putting knives in their door *as JoJo and Patty were in order to keep Juan out?*
>
> A. Yes.
>
> Q. It's possible they did it without your knowledge, knowing their sisters did it?
>
> A. Yes. [Emphasis added.]

Mares contends that this is a case of "evidentialy [sic] harpooning," in which the prosecutor, "knowing full well that inquiry into JoJo's and Patty's motives and acts had just been judicially restricted, nonetheless wilfully interjected them into the case." Mares complains that these questions established that the girls put the knife in the door to keep Mares out. However, as we just determined, the prosecutor had properly elicited testimony from Victoria that JoJo and Patty put knives in their door because they did not want Mares to come in whenever he felt like it. This is the same as saying that they did this to keep Mares out.

██ The prosecutor's question simply rephrases the answer that the witness had already given and which was properly elicited. We see no indication that it

introduced further, prohibited *Whitty* evidence. We conclude that the prosecutor's questioning was proper. Further, the questions did not meet with any objection from Mares. Therefore, the issue is waived for purposes of appeal. Sec. 901.03(1)(a), Stats.; *see also State v. Damon,* 140 Wis. 2d 297, 300, 409 N.W.2d 444, 446 (Ct. App. 1987).

*By the Court.*—Judgment and order affirmed.