COURT OF APPEALS
DECISION
DATED AND FILED

October 6, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.** **2018AP164-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. 2011CF3900

**IN COURT OF APPEALS
DISTRICT I**

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

ALEXANDER JEROME WILEY,

DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Milwaukee County: DAVID L. BOROWSKI, Judge. *Affirmed.*

Before Brash, P.J., Dugan and Fitzpatrick, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Alexander Jerome Wiley, *pro se*, appeals a judgment of conviction entered after a jury found him guilty of two felonies:

second-degree reckless homicide by use of a dangerous weapon as a party to a crime, and possession of a firearm by a felon. Wiley raises three claims: (1) the circuit court erroneously permitted a lay witness to give hearsay testimony; (2) he suffered a violation of his sixth amendment right to confront the witnesses against him because a medical examiner who did not conduct the autopsy on the homicide victim testified as an expert about the victim's cause of death; and (3) the State failed to present sufficient evidence to prove him guilty of second-degree reckless homicide beyond a reasonable doubt. We reject his claims and affirm.

## BACKGROUND

¶2 The State initially filed a criminal complaint charging Wiley with first-degree reckless homicide by use of a dangerous weapon as a party to a crime. The complaint alleged that, on August 2, 2011, Darrin Moore sustained a gunshot wound to the head while driving his van in the 3200 block of North 15th Street in Milwaukee, Wisconsin. He was conveyed to the hospital, where medical personnel determined that his brain activity had stopped and declared him dead two days later. An investigation led police to question Gerald R. Ray who gave a statement to detectives admitting that he and his friend, Low, both shot at the van.[1] A detective also interviewed Ray's girlfriend, Shanika Thomas, who identified Low as Wiley.

¶3 Wiley entered a plea of not guilty and the parties engaged in several years of pretrial litigation. In February 2014, the matter proceeded to trial on two

---

[1] The record includes references to "Low," "Lo," "L-Lo" and "L.O." For purposes of resolving Wiley's claims on appeal, these variants are not relevant. We use the spelling "Low" throughout this opinion except when another version is used in a quote from the court transcript.

charges: the original homicide count and an additional count of possessing a firearm as a felon.[2]

¶4 At the outset of the trial, Wiley's attorney gave an opening statement advising the jury that Ray was "the one person" who would testify to Wiley's involvement in the shooting. Counsel told the jury that Ray talked to police numerous times about the shooting and that, after initially denying involvement, his "story starts to change." Counsel said that over time Ray admitted having some knowledge of the shooting, and "pretty soon th[e police a]re suggesting names to [Ray]. They're suggesting other people who might be involved. The name 'Lo' comes up." Counsel went on: "Finally, [] Ray changes his story and says I was there at the time of the shooting. I was there with a guy named Lo, whose name had been suggested to him.... Lo shot the person." Counsel said that police next showed Ray a picture of Wiley, and Ray "identifie[d] Wiley as 'Lo.' So what's the motivation for [] Ray to make up this story about [] Wiley? The evidence will show that [Ray is] charged with a very serious crime ...." "[H]e cuts a deal in which that charge is go[ing to] be reduced." Counsel concluded: "The evidence will show that he has every reason in the world to lie about [] Wiley, and he does."

---

[2] Although the second count against Wiley was titled "possession of firearm by felon," the State did not allege that Wiley was a felon but rather alleged that, before August 2, 2011, he had been adjudicated delinquent for an act that would be a felony if committed by an adult. *See* WIS. STAT. § 941.29(2)(b) (2011-12). Wiley stipulated to the delinquency adjudication at the beginning of the trial.

All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

¶5       Following opening statements, a police sergeant testified that, on the night of August 2, 2011, he was on duty when he heard gunshots nearby.  He immediately proceeded to the 3200 block of North 15th Street and found a van facing against traffic.  Moore was in the driver's seat, and the sergeant observed that "it was quite obvious that [Moore] had been shot....  There was a large amount of blood as well as brain matter inside the vehicle as well as all over his head."  A detective testified that, when he searched the van, he noted that the driver's side front window was shattered, and he found a bullet fragment in the front passenger compartment.  Additional detectives testified that they found bullets, bullet fragments, and spent bullet casings at and around the scene of the shooting.  A firearm and tool mark examiner testified that he analyzed the bullets, bullet fragments, and casings collected during the investigation.  The examiner determined that the caliber of some of these items was forty-five millimeters while other items were nine millimeters, and he testified that "different sizes of ammunition ... would be fired in different guns."

¶6       Dr. Brian Peterson testified as an expert for the State over Wiley's objection.  Dr. Peterson told the jury that he was the Milwaukee County Chief Medical Examiner, and that another physician in his office, Dr. Krintinca Giese, conducted the autopsy of Moore.[3]  Dr. Peterson went on to testify that he was a physician who was board certified in forensic pathology and that he had reviewed the digital images, reports, notes, and documentation from the autopsy that Dr. Giese performed as well as the toxicology and investigative reports prepared

---

[3] The record indicates that, at the time of trial, Dr. Giese was no longer employed by the Milwaukee County Medical Examiner's Office and had moved out of state.

by laboratory personnel and investigators employed in the medical examiner's office. Dr. Peterson testified that, based upon his review of these materials, he was able to reach an independent conclusion as to the cause and manner of Moore's death.

¶7 Dr. Peterson testified that the cause of Moore's death was "straightforward. It's a gunshot wound to the head." He said that the entrance wound was atypical, and he explained that its unusual shape resulted from a bullet that was deformed when it struck an object before hitting Moore's left temple. Dr. Peterson determined that the object was the glass window of Moore's vehicle because car windows break in a way that causes right-angle cuts, called "dicing," when the glass hits the skin, and Moore had dicing on his cheek. As to the manner of death, Dr. Peterson ruled out suicide because Moore could not have shot himself through the glass of the window. Dr. Peterson concluded that Moore's death was a homicide, and he explained to the jury that in forensic pathology, "we use the term homicide simply to mean death by hands of another.... [S]omebody else did it."

¶8 Next, a detective testified that he witnessed Moore's autopsy and took custody of the physical evidence recovered during the procedure. The detective then identified the bullet fragment that was removed from Moore's left temple as that physical evidence.

¶9 Deangelo Copeland and Michael Hall both testified that they were passengers in the van that Moore was driving on August 2, 2011. Copeland and Hall heard shots ring out from the driver's side of the vehicle. Both men ducked for cover and then felt the van crash and come to a stop. Copeland testified that he saw Moore "slumped over" after the crash. He appeared to be shot. Hall similarly

testified that Moore's head was "slouched over," and he described blood "pouring" from Moore. Both Copeland and Hall testified that they got out of the van after the crash and fled on foot.

¶10    Ray also testified. He identified Wiley in the courtroom as the person he knew as Low. Ray told the jury that, on August 2, 2011, he and Wiley saw a person subsequently identified as Moore sitting with a shotgun in front of a corner store. Ray said he pulled out his forty-five caliber handgun, and he and Wiley told Moore to "move around.... [G]et away from the area." Ray testified that Moore got into his van and drove down the block.

¶11    Later that evening, Ray and Wiley saw Moore's van and opened fire. Ray testified that, after both men fired several shots at the van, he saw it crash into some parked cars. Ray and Wiley then fled the scene. Ray said that as he ran, he saw Wiley's gun, which Ray identified as a nine-millimeter handgun.

¶12    Ray said that he hid his gun and then talked to Thomas about the shooting because he wanted her to know that the police might be looking for him. He did not give her many details, but he testified that he "[s]omewhat" told her about the people involved.

¶13    Ray testified that, approximately a week after the shooting, the police arrested and questioned him. He initially denied any involvement in the shooting, but on his fourth day in custody he admitted his participation after he learned that Thomas had talked to the police. Ray further testified that, as the questioning progressed, he admitted that Wiley was also involved.

¶14    Ray acknowledged that he had been charged with first-degree reckless homicide in Moore's death. He further acknowledged that he had reached

a plea agreement in which the State agreed to reduce the charge to second-degree reckless homicide and recommend ten years of initial confinement in exchange for his guilty plea to the reduced charge and his testimony at Wiley's trial.

¶15    Wiley, by counsel, cross examined Ray at length about the differing stories he told the police during his interrogation.  Ray agreed that the police suggested to him that "it's always best if you're the first one" to tell the police what happened.  Ray also agreed that the police asked him if he knew someone "by the nickname of Lo" and suggested that they thought Low was involved in the shooting.  Ray admitted that he changed his story over time "to protect [him]self," and said that he was testifying "because [he was] getting a deal."

¶16    On re-direct examination, Ray explained that he did not want Wiley to become a suspect in Moore's shooting death and therefore did not name Wiley as a co-actor during his initial police interrogation.  Ray then reiterated that Wiley was the person firing shots with Ray on the evening of August 2, 2011.

¶17    After Ray testified, the State called Thomas to testify about Ray's statement to her that Wiley participated in the shooting that led to Moore's death. The defense objected, contending that the proposed testimony was inadmissible hearsay.  The circuit court overruled the objection, concluding that the proposed testimony constituted an admissible prior consistent statement by Ray who "has given different stories at different times, [and] has, depending on who you believe, fabricated one thing or another, lied either a lot or a little …."

¶18    Thomas testified that Ray is the father of her child, and she was dating him at the time of the shooting.  She testified that, before Ray was arrested, he told her that he and "L.O." felt threatened by a man with a gun, and they shot at him.  Thomas went on to say that she talked to the police when they came to her

home to arrest Ray, and she told them that "L.O." was involved in the shooting. From the witness stand, she identified Wiley as "L.O."

¶19    The State next presented testimony from Tiffany Williams and her children, Tyrese and Tamia.[4]   Their testimony established that, in August 2011, they were living in a house near where Moore was shot.  All three family members testified that they did not recall anything that tied Wiley to the shooting.

¶20    The State concluded by presenting the testimony of Milwaukee Police Detective Billy Ball.  He said that he interviewed Tyrese, Tiffany, and Tamia as part of the investigation into the shooting on August 2, 2011, and Detective Ball described the substance of those interviews.

¶21    Tyrese said that, on the night of the shooting, Ray and Wiley knocked on the back door of the Williams's home and told Tyrese that they needed to get bullets out of the basement.  Tyrese said that he heard gunshots shortly after Ray and Wiley left the home.  Tamia told Detective Ball that, on the night of the shooting, she heard a knock at the back door of her home and observed Ray and Wiley outside.  Shortly after they left, she heard numerous gunshots.  As for Tiffany, she told Detective Ball that she recognized the voices of the two men who came to her back door on the night of the shooting and that the voices were those of Ray and Wiley.  Finally, Detective Ball testified that Tyrese, Tamia, and Tiffany all identified Ray and Wiley from photographs.

---

[4] Because three members of the Williams family testified, we refer to each Williams family member by his or her given name.

¶22 After the State rested, Wiley presented two witnesses from the Milwaukee Police Department. Both witnesses testified to inconsistent statements that Ray gave at various times. Wiley waived his right to testify.

¶23 At the close of the evidence, the circuit court instructed the jury on the two charged offenses and on a lesser-included homicide offense, namely, second-degree reckless homicide. The jury found Wiley guilty of the lesser included offense and of possessing a firearm as a felon. He appeals. We discuss further facts as necessary to address the issues he presents.

## ANALYSIS

¶24 Wiley raises three issues on appeal. We discuss each in turn.

## I. The Circuit Court Properly Admitted Thomas's Testimony Under WIS. STAT. § 908.01(4)(a)2., as Evidence of Ray's Prior Consistent Statement.

¶25 Wiley argues that the circuit court erred in overruling his hearsay objection to Thomas's testimony. Our standard of review is deferential. *See State v. Mayo*, 2007 WI 78, ¶31, 301 Wis. 2d 642, 734 N.W.2d 115. We will not disturb a circuit court's evidentiary ruling if the circuit court "examined the relevant facts, applied a proper legal standard, and reached a reasonable conclusion using a demonstrated rational process." *Id.* Moreover, we "may consider acceptable purposes for the admission of evidence other than those contemplated by the circuit court, and may affirm the circuit court's decision for reasons not stated by the circuit court." *State v. Hunt*, 2003 WI 81, ¶52, 263 Wis. 2d 1, 666 N.W.2d 771.

¶26     We conclude that the circuit court did not err by overruling Wiley's hearsay objection to Thomas's testimony and admitting it as Ray's prior consistent statement.

¶27     Hearsay is generally inadmissible.  *See* WIS. STAT. § 908.02.  It is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." WIS. STAT. § 908.01(3).  A declarant's prior out-of-court statement is not hearsay, however, and therefore not excluded under § 908.02, if the statement satisfies the requirements of § 908.01(4)(a).  *See State v. Miller*, 231 Wis. 2d 447, 470, 605 N.W.2d 567 (Ct. App. 1999).  "Section 908.01(4)(a)2[.] requires that:  (1) the declarant testify at trial and be subject to cross-examination concerning the statement;  (2) the statement is consistent with the declarant's testimony; and (3) the statement rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive."  *State v. Mares*, 149 Wis. 2d 519, 525-26, 439 N.W.2d 146 (Ct. App. 1989).  The rationale underlying the rule of admissibility for prior consistent statements is that if a witness "related a version of the events consistent with [the witness's] courtroom testimony before the recent fabrication, improper influence or motive arose, the existence of [that] prior consistent statement rebuts the charge of recent fabrication or improper influence or motive."  *State v. Peters*, 166 Wis. 2d 168, 177, 479 N.W.2d 198 (Ct. App. 1991).  Accordingly, "prior consistent statements must predate the alleged recent fabrication or improper influence or motive before they have probative value."  *Id.*

¶28     Here, Thomas's testimony satisfied each component of WIS. STAT. § 908.01(4)(a)2.  First, Ray testified at trial that he and Wiley shot at Moore on August 2, 2011, that Ray discussed the shooting with Thomas before his arrest, and that he shared information with her about who else was involved.  Ray was

available for cross-examination, and Wiley cross-examined Ray thoroughly regarding his testimony. Second, Thomas's testimony—describing Ray's statements to her that he and Wiley were involved in the shooting—was consistent with Ray's testimony. Third, Thomas's testimony served to rebut Wiley's express and implied allegations that Ray's testimony implicating Wiley was a recent fabrication and the product of both improper influence by the State and a motive to lie.

¶29    Wiley focuses his argument on the third prong of the analysis. He asserts that the incriminating statements Thomas described do not rebut Wiley's allegations because the statements do not predate Ray's motive to lie.[5] In support, Wiley points to Ray's testimony that he had a motive to lie from the moment he fled the scene of the shooting. Our review, however, is not limited to considering whether Ray's out-of-court statements served to rebut an alleged motive to lie. A prior consistent statement is not hearsay if it rebuts an express or implied charge of recent fabrication or improper influence and predates that alleged recent fabrication or improper influence. *See Peters*, 166 Wis. 2d at 177; *see also* WIS. STAT. § 908.01(4)(a)2.

---

[5] In the reply brief, Wiley argues for the first time that the statements Thomas claimed Ray made before his arrest were *inconsistent* with Ray's testimony at trial and thus do not satisfy the second prong of the analysis for admitting prior *consistent* statements under WIS. STAT. § 908.01(4)(a)2. Normally, we do not consider arguments raised for the first time in a reply brief, *see Schaeffer v. State Pers. Comm'n*, 150 Wis. 2d 132, 144, 441 N.W.2d 292 (Ct. App. 1989), and we abide by that rule here. Nonetheless, we observe for the sake of completeness that a statement is not hearsay if the declarant testifies at trial, is subject to cross-examination concerning the statement, and the statement is inconsistent with the declarant's testimony. *See* § 908.01(4)(a)1. Accordingly, were we to consider Wiley's concession that Thomas testified about Ray's prior inconsistent statements, the outcome of our review would remain the same: Thomas's testimony was not hearsay. *See id.*

¶30     Here, Wiley alleged in his opening statement that Ray changed his story during police questioning and named Wiley as a co-actor at the officers' suggestion. During Ray's cross-examination, Wiley sought to develop that theme. He suggested that the police led Ray to implicate Wiley, that officers hinted to Ray that "Lo is someone they th[ought] [wa]s involved," and that Ray responded by offering the police the "name [he] need[ed] to give them." Indeed, as the State points out, Wiley's cross examination of Ray included a multitude of references to the police allegedly suggesting to him that Wiley was involved in the shooting. In addition, Wiley cross-examined Ray about his plea agreement, asking him whether he was "here today ... testifying … because ... [he was] getting a deal" from the prosecutor. Ray answered: "Right."

¶31     In closing argument, Wiley emphasized a theory that Ray named Wiley as a participant in the shooting only to earn a benefit from the State. Wiley told the jury that Ray was "a street-wise guy .... [H]e knows how to play the game, and he knows he's got to offer something up to the police. And they've been asking him repeatedly about Low .... And so [Ray] tells them what they want to hear, and he gets a deal for it …."

¶32     Despite Wiley's contentions, the record shows that, throughout the trial, Wiley contended both expressly and implicitly that Ray not only had motives to lie but also that he belatedly fabricated an accusation against Wiley during the course of a lengthy custodial interrogation. Further, Wiley suggested that Ray clung to that accusation because he was subjected to improper influence by state actors who offered him a reward for his tale. Therefore, Ray's pre-arrest confession to Thomas naming Wiley as the second shooter constituted a prior statement that was consistent with Ray's testimony at trial and that predated the

12

alleged fabrication and the improper influence of state actors. Such statements are admissible under WIS. STAT. § 908.01(4)(a)2.

## II. Dr. Peterson's Testimony About the Cause and Manner of Moore's Death Did Not Violate Wiley's Constitutional Right to Confront Witnesses.

¶33 Wiley alleges that Dr. Peterson's testimony about the autopsy results violated his right to confront adverse witnesses. In Wiley's view, only Dr. Giese—the person who actually conducted the autopsy—could testify about the autopsy results. We disagree.

¶34 The Confrontation Clause in the Sixth Amendment of the United States Constitution guarantees a criminal defendant the fundamental right to confront adverse witnesses.[6] *See State v. Griep*, 2015 WI 40, ¶18, 361 Wis. 2d 657, 863 N.W.2d 567. "[W]hether the admission of evidence violates a defendant's right to confrontation is a question of law subject to independent appellate review." *State v. Williams*, 2002 WI 58, ¶7, 253 Wis. 2d 99, 644 N.W.2d 919.

¶35 In *Griep*, our supreme court considered a Confrontation Clause challenge to testimony from an expert witness who established the defendant's blood alcohol concentration at a trial on a charge of operating a vehicle while intoxicated. *See Griep*, 361 Wis. 2d 657, ¶1. The defendant alleged that he suffered a violation of his right to confront a witness against him because the

---

[6] The Wisconsin Constitution also protects a defendant's right to confront witnesses. *See* WIS. CONST. art. I, § 7; *State v. Hale*, 2005 WI 7, ¶43, 277 Wis. 2d 593, 691 N.W.2d 637. Wiley does not cite the Wisconsin Constitution or appear to rely on it.

expert had not conducted the original analysis and, in the defendant's view, the expert's testimony was an insufficient substitute for testimony from the absent expert who conducted the original tests. *See id.*, ¶¶1-2. The ***Griep*** court, recognizing that an expert witness may not serve as a "mere conduit" for the opinions of a non-testifying analyst, *see id.*, ¶53 (citation omitted), applied a two-prong test to determine whether expert testimony that is "based in part on tests conducted by a non-testifying analyst satisfies a defendant's right of confrontation," *see id.*, ¶47. Under the two-prong test, an expert's testimony satisfies the defendant's right of confrontation if the testifying expert has "(1) reviewed the [original] analyst's tests, and (2) formed an independent opinion to which he [or she] testified at trial." ***Id.***

¶36 Here, Dr. Peterson, the chief medical examiner of Milwaukee County, established his expertise in the area of forensic pathology. He then testified that he had reviewed the digital images, reports, notes, and documentation of Moore's autopsy, as well as a report prepared by the investigative arm of the Milwaukee County Medical Examiner's Office and a toxicology report prepared by personnel from the office laboratory. Dr. Peterson told the jury that, based on his substantial experience in the field of forensic pathology and his review of the autopsy materials and related reports, he had formed independent conclusions to a reasonable degree of medical certainty that Moore died of a gunshot wound to the head and that the death was the result of homicide rather than suicide. Dr. Peterson's testimony thus satisfied the two-prong test set forth in ***Griep***. Moreover, Dr. Peterson did not testify about Dr. Giese's opinions, nor did the State introduce Dr. Giese's autopsy report as evidence. Dr. Peterson, therefore, was not a conduit for Dr. Giese's conclusions.

¶37 Wiley argues that this court should overrule *Griep* and the Wisconsin authorities on which it rests in light of various decisions of the United States Supreme Court addressing a defendant's rights under the Confrontation Clause. Specifically, he directs our attention to *Crawford v. Washington*, 541 U.S. 36 (2004), and *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), and asserts that, in light of these cases, Wisconsin's current confrontation clause jurisprudence lacks "authoritative precedential value."

¶38 We decline Wiley's invitation to overrule Wisconsin supreme court decisions because we have no authority to take such a step. *See Cook v. Cook*, 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997) (stating that only the supreme court may overrule its decisions). Moreover, Wiley is incorrect in asserting that we are at liberty to disregard *Cook* in light of *State v. Jennings*, 2002 WI 44, ¶19, 252 Wis. 2d 228, 647 N.W.2d 142. *Jennings* holds that we may "not follow a decision of [our supreme] court on a matter of federal law if it conflicts with a *subsequent* controlling decision of the United States Supreme Court." *Id.* (emphasis added). All of the United States Supreme Court cases that Wiley cites, however, were decided *before Griep*. Indeed, our supreme court in *Griep* considered *Crawford* and *Bullcoming*, among other cases, and formulated this state's approach to confrontation clause analysis in light of those authorities. *See Griep*, 361 Wis. 2d 657, ¶23. Under the analysis required by *Griep*, Dr. Peterson's testimony did not run afoul of the Confrontation Clause.

¶39 We must also reject Wiley's argument that Dr. Peterson's testimony should have been excluded because it rested on inadmissible hearsay found in the autopsy report. Wiley acknowledges that WIS. STAT. § 907.03 permits an expert to offer an opinion based on inadmissible hearsay, but he asserts that the Confrontation Clause renders § 907.03 unconstitutional. Wiley fails, however, to

15

show that he raised this constitutional challenge to § 907.03 in circuit court, and we will not scour the record in search of such a challenge. *See **State v. Carter***, 2017 WI App 9, ¶21, 373 Wis. 2d 722, 892 N.W.2d 754. Because Wiley fails to demonstrate that he presented his constitutional challenge to § 907.03 in circuit court, he is not entitled to pursue the challenge in this court. *See **State v. Champlain***, 2008 WI App 5, ¶17, 307 Wis. 2d 232, 744 N.W.2d 889. Nonetheless, for the sake of completeness, we observe that this court has expressly rejected the argument that the right of confrontation renders § 907.03 unconstitutional. *See **State v. Heine***, 2014 WI App 32, ¶12, 354 Wis. 2d 1, 844 N.W.2d 409. We may not overrule a prior decision of this court. *See **Cook***, 208 Wis. 2d at 189-90. For all the foregoing reasons, we conclude that Wiley's objections to Dr. Peterson's testimony does not afford Wiley any basis for relief.

### III. The Evidence Was Sufficient to Support Wiley's Homicide Conviction.

¶40 Before the jury could find Wiley guilty of second-degree reckless homicide by use of a dangerous weapon as a party to a crime, the State was required to prove beyond a reasonable doubt that: (1) Wiley caused Moore's death; (2) by criminally reckless conduct; (3) while using a dangerous weapon; and (4) he either directly committed the crime or aided and abetted the person who committed it. *See* WIS. STAT. §§ 940.06 (2011-12); 939.05 (2011-12), 939.63 (2011-12); WIS JI—CRIMINAL 1060, 990, 400. On appeal, Wiley argues that the evidence presented was insufficient to prove either the cause and manner of Moore's death or that Wiley participated in the events that caused Moore's death. We are not persuaded.

¶41 Our review is highly deferential to the jury's verdict. *See **State v. Beamon***, 2013 WI 47, ¶21, 347 Wis. 2d 559, 830 N.W.2d 681. We will "not

reverse a conviction unless the evidence, viewed most favorably to the [S]tate and the conviction, is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990). The test is not whether this court is "convinced of the defendant's guilt beyond reasonable doubt, but whether this court can conclude the trier of facts could, acting reasonably, be so convinced by evidence it had a right to believe and accept as true." *Id.* at 503-04 (citations and brackets omitted). It is the jury's role to determine the credibility of the witnesses and the weight of the evidence. *See id.* at 504.

¶42 We first consider Wiley's challenge to the sufficiency of the evidence proving the cause and manner of Moore's death. That evidence included testimony from Dr. Peterson, who opined that Moore died because a bullet struck him in the head. Based on the shape of the wound and the dicing on Moore's cheeks, Dr. Peterson determined that the bullet passed through a car window before striking Moore and, therefore, someone other than Moore himself must have fired the fatal shot. Wiley argues that Dr. Peterson's testimony "can not be given any weight by the trier of fact, or [by] the court during its review," because, says Wiley, the State failed to prove the facts underlying Peterson's conclusions. In support, Wiley cites *State v. Watson*, 227 Wis. 2d 167, 595 N.W.2d 403 (1999), which he believes requires that expert testimony be "based on evidence of record."

¶43 As the State correctly explains, Wiley misreads *Watson*. There, the circuit court admitted an expert's testimony at a pretrial hearing in a commitment proceeding. *See id.* at 179, 189. However, in making findings of fact on the question of whether the State established probable cause to proceed, the circuit court chose not to give any weight to the expert's opinion because it was based

17

solely on a single inadmissible and disputed hearsay statement. *See id.* at 196. On appeal, our supreme court held that the circuit court properly admitted the expert's testimony. *See id.* 190-91. The supreme court also held that a trier of fact may disregard an expert opinion if it is based solely on inadmissible hearsay. *See id.* at 203. In reaching that conclusion, the supreme court explained that "the trier of fact must understand its authority to disregard or devalue the expert's opinion if it is not based on evidence of record." *Id.* at 201. Nothing in **Watson**, however, requires the State to offer independent evidence to establish the underlying facts that support an expert opinion. To the contrary, **Watson** expressly holds that, pursuant to WIS. STAT. § 907.03, the circuit court may admit expert testimony that is based on inadmissible hearsay. *See **Watson***, 227 Wis. 2d at 195-96. **Watson** merely reflects that "if an expert's opinion were based solely on inadmissible hearsay, a circuit court *could* properly decide that the opinion did not establish probable cause." *See **State v. Mark***, 2008 WI App 44, ¶35, 308 Wis. 2d 191, 747 N.W.2d 727 (emphasis added).

¶44    In the instant case, the fact finder—the jury here—heard evidence that Dr. Peterson did not personally conduct Moore's autopsy and that he formed his opinions in light of facts contained in the autopsy report, the toxicology report, the investigative report, and the digital pictures taken during the autopsy. The jury also was instructed that it was the sole judge of the credibility of the witnesses and the weight of their testimony and was "not bound by any expert's opinion." The jury was thus fully equipped to consider Dr. Peterson's testimony and entitled to assign it whatever weight the jury thought the testimony deserved.

¶45 Moreover, Dr. Peterson's testimony was not the only evidence that Moore's death was caused by someone shooting Moore in the head.[7] Ray testified that he had agreed to plead guilty to second-degree reckless homicide in Moore's death based on his actions of August 2, 2011, when he and Wiley shot at Moore in his van. Copeland and Hall testified that they heard gunfire while they were passengers in the van that Moore was driving on August 2, 201l. The van then crashed into a parked car, and Copeland and Hall saw that Moore appeared to have been shot. Police who arrived at the crash site moments later found Moore with a gunshot wound to the head and observed "brain matter inside the vehicle as well as all over his head." A detective who witnessed Moore's autopsy identified the bullet fragment found in Moore's left temple. While some of this evidence is circumstantial, the law recognizes that such evidence is often stronger than direct evidence and no less compelling. *See **Poellinger***, 153 Wis. 2d at 501.

¶46 The evidence amply supported a finding that Moore died because someone shot him in the head. Indeed, Wiley did not dispute the question of causation at trial, arguing to the jury that "the contested issue" was whether he was involved in the shooting. Accordingly, we reject Wiley's challenge to the sufficiency of the evidence presented to prove the cause of Moore's death.

¶47 Wiley also challenges the sufficiency of the evidence proving his involvement in Moore's shooting. He contends that Ray's testimony was

---

[7] To the extent that Wiley implies that a medical examiner's testimony was required to prove Moore's cause of death, he is wrong. *See **State v. McDougle***, 2013 WI App 43, ¶¶4, 17, 347 Wis. 2d 302, 830 N.W.2d 243 (explaining that "it is simply not true" that a medical examiner's testimony and reports from an autopsy are required to "conclude that the victim's death was a gunshot homicide"(brackets omitted)).

discredited,[8] Thomas's testimony was inadmissible, and Detective Ball's testimony was inadequate. These contentions do not provide a basis for relief.

¶48 Ray testified to Wiley's involvement in the shooting. Although Wiley asserts that Ray was not credible, "it is not our function to review questions as to weight of testimony and credibility of witnesses. These are matters to be determined by the trier of fact." *See **State v. Smith***, 2012 WI 91, ¶33, 342 Wis. 2d 710, 817 N.W.2d 410 (citation omitted).

¶49 Thomas testified that, shortly after the homicide, Ray told her that he and Wiley were involved in shooting a man who they felt was threatening. We have already explained why the circuit court properly admitted her testimony.

¶50 Finally, Detective Ball testified about his interviews with three members of the Williams family who lived near the scene of the shooting and recognized Wiley and Ray, visually and/or orally, as the men who came to the family's door on the night that Moore was shot. Tyrese described how Wiley and Ray said that they needed some bullets. Tyrese and Tamia described hearing gunshots after Wiley and Ray left the home.

¶51 Wiley asserts that Detective Ball's testimony standing alone is insufficient to prove that he was involved in Moore's homicide. Detective Ball's

---

[8] Wiley asserts that, because the State said in closing argument that the jury could not find Wiley guilty based solely on Ray's testimony, the State "affirmatively asserted that in the state's point of view Ray's testimony had no probative value or force to support a conviction." Wiley's assertion is not true. The State appropriately asked the jury to consider the totality of the evidence before reaching a verdict. Specifically, the State argued that the jury should consider how the direct and circumstantial evidence "work together and not just based upon Gerald Ray, though I do ask you to consider it, not just based upon what Shanika Thomas said or what the Williams's have said, but put each of those things together."

testimony, however, does not stand alone.  It is but one piece of the evidence that the State presented to prove Wiley's guilt.  In light of the totality of the evidence, we cannot say that no trier of fact, acting reasonably, could have found that Wiley was involved in Moore's homicide.  For all the foregoing reasons, we affirm.

*By the Court.*—Judgment affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)5.